Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.

DAVID ROLAND HINKSON,
          *Defendant-Appellant.*

No. 05-30303

D.C. No.
CR-04-00127-RCT

OPINION

Appeal from the United States District Court
for the District of Idaho
Richard C. Tallman,* Presiding

Argued and Submitted
May 7, 2007—Seattle, Washington

Filed May 30, 2008

Before: Procter Hug, Jr., M. Margaret McKeown, and
William A. Fletcher, Circuit Judges.

Opinion by Judge William A. Fletcher;
Dissent by Judge McKeown

---

*Richard C. Tallman, U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

**COUNSEL**

Dennis P. Riordan, Riordan & Riordan, San Francisco, California, Curtis R. Smith, Idaho Falls, Idaho, for the appellant.

Michael D. Taxay, Counter-Terrorism Section, Alan Hecht-kopf, and Elissa Hart, Tax Division, United States Department of Justice, Washington, D.C., for the appellee.

**OPINION**

W. FLETCHER, Circuit Judge:

Following a two-week trial in federal district court in Boise, Idaho, a jury convicted David Roland Hinkson of soliciting the murder of three federal officials. The government's star witness supporting the conviction was Elven Joe Swisher. Wearing a Purple Heart lapel pin on the witness stand, Swisher testified that he had told Hinkson that he was a Korean War combat veteran and that Hinkson, impressed by Swisher's military exploits, solicited him to kill the officials.

The government maintained in its opening statement to the jury that Swisher was a Korean War combat veteran, and it maintained throughout the trial that Hinkson's understanding of Swisher's military exploits showed that he was serious in his solicitations of Swisher. The government now concedes that Swisher neither served in combat nor earned any personal military commendations, and that Swisher presented a forged military document in court and repeatedly lied under oath at trial about his military record.

On appeal, Hinkson makes three arguments. First, he argues that the district court wrongly precluded him from introducing evidence showing that Swisher presented a forged document and lied on the stand. Second, he argues that the

prosecutor engaged in misconduct when he invoked Swisher's military service in his closing argument despite having substantial reason to suspect that Swisher had not been truthful. Third, he argues that he is entitled to a new trial based upon his discovery after trial of evidence that conclusively establishes Swisher's fabrications.

We agree with Hinkson's third argument. Because Hinkson's conviction substantially rests upon the testimony of a witness who had been conclusively shown, by the time Hinkson moved for a new trial, to be a forger and a liar, we hold that the district court abused its discretion in denying Hinkson's motion for a new trial. We do not reach Hinkson's first and second arguments.

## I.   Background

In an indictment filed on September 21, 2004, a federal grand jury in Idaho charged Hinkson with soliciting the murders of Assistant U.S. Attorney Nancy Cook, IRS Special Agent Steven Hines and U.S. District Court Judge Edward J. Lodge. All three officials had been involved in the investigation and prosecution of Hinkson on tax and currency structuring charges. Hinkson appeals his conviction on those charges in a companion case. We affirm that conviction in a separate memorandum disposition.

The superseding indictment in this case contained eleven counts. Counts 1-6 charged that Hinkson, in violation of 18 U.S.C. § 373, sought to persuade an acquaintance named James Harding to murder Cook, Hines and Lodge, first in January 2003 (Counts 1-3) and again in March 2003 (Counts 4-6). Counts 7-9 charged that Hinkson, again in violation of 18 U.S.C. § 373, sought in December 2002 or January 2003 to persuade Swisher to murder Cook, Hines and Lodge. Counts 10 and 11 charged that Hinkson, in violation of 18 U.S.C. § 115, personally threatened to kill the children of Cook and Hines.

Hinkson was convicted on only the Swisher-related counts, Counts 7-9. The jury acquitted Hinkson on Counts 1-3, 10, and 11, and deadlocked on Counts 4-6. Because this appeal involves only the Swisher-related counts, we focus our discussion on them.

At several points during Hinkson's trial, the prosecutor emphasized Swisher's military background, and Hinkson's understanding of that background, in an effort to show the seriousness of Hinkson's solicitations. In his opening statement to the jury on January 11, 2005, the prosecutor stated that Swisher "was a Marine, a Combat Veteran from Korea during the Korean conflict. He was not adverse to this kind of violent, dangerous activity; but he wanted no part of murdering federal officials." However, during direct examination of Swisher three days later on January 14, the prosecutor did not ask Swisher whether he was, in fact, a Korean War combat veteran. Rather, the prosecutor asked only what had been his branch of service and what he had told Hinkson about his military experience in Korea.

Swisher came to the witness stand wearing a replica of a Purple Heart on his lapel. A Purple Heart is an award given to members of the United States military who are wounded in combat. Swisher testified that he first became acquainted with Hinkson in 2000. According to Swisher, he had done some consulting work for Hinkson's company, WaterOz, and the two men had developed a friendship. Swisher testified that he had served in the Marine Corps. He testified further that he discussed his military exploits with Hinkson on several occasions and told Hinkson that he had been in combat in Korea as a Marine. According to Swisher, Hinkson asked whether he had ever killed anyone, to which Swisher said he responded, "Too many."

Swisher testified that on various occasions in 2001 and early 2002, he and Hinkson discussed Hinkson's legal problems, particularly a civil suit brought against Hinkson by a

former WaterOz employee. Swisher testified that Hinkson expressed "considerable" anger toward the employee's lawyer, Dennis Albers, and spoke in graphic detail about wanting to see Albers and his family "tortured and killed." Swisher testified that Hinkson offered him "$10,000 a head to do it," but Swisher "told [Hinkson] he was out of his mind and he needed to knock that kind of BS off."

Swisher testified that in July or August of 2002, Hinkson began to focus on his problems with federal officials. According to Swisher, Hinkson stated that Cook and Hines "had been harassing him a great deal," "abused the judicial system," "cost him a lot of money," and "didn't deserve to live." Swisher testified that Hinkson asked him if he "remembered the offer he made regarding Mr. Albers and his family" and "said he wanted that done, basically, with Ms. Cook and her family and Mr. Hines and his family." Swisher testified that Hinkson told him, "I know you're used to it. I mean, you have killed people [while serving in the military]." Swisher testified that he replied that he would report Hinkson to the authorities if Hinkson "continue[d] talking that way."

Swisher testifed that after Hinkson was arrested on tax charges in November 2002, he and Swisher had further conversations. According to Swisher, Hinkson "was extremely hostile to all of the people who had been involved in that arrest." In January 2003, Hinkson "went through the names of the people that had offended him, and added a federal judge by the name of Lodge to that list." Swisher testified that Hinkson then offered him "[a]t least $10,000 a head" to have "them all treated the way that the initial offer regarding Albers and his family had been handled" — that is, "[t]ortured and killed." Swisher testified that Hinkson spoke in a "pleading fashion" about how "he just had to have this done." Swisher replied that he "never wanted to hear that again." After that January 2003 exchange, the two men had a serious falling out, eventually resulting in a lawsuit and a nasty feud. Swisher testified that sometime after April 2003

he reported Hinkson's solicitations to a local Idaho prosecutor. At the time of his testimony at Hinkson's trial in January 2005, Swisher was a bitter enemy.

On cross examination, defense counsel did not initially inquire into Swisher's military background. Instead, counsel sought to discredit Swisher by identifying inconsistencies in his testimony and by emphasizing the ongoing feud between Swisher and Hinkson. However, after having indicated that he had no further questions for Swisher, counsel asked to approach the bench. At the sidebar, he told the court, "For quite some time, [the defense has] been trying to dig into [Swisher's] military history." Counsel explained that, "[b]ecause of his age and because of the time of the war, we don't believe he was in the war. We also don't believe that he got a Purple Heart or was in combat." Counsel then told the court that he had just been "handed a letter from the National Personnel Records Center indicating that . . . the records fail to show that [Swisher] ever was recommended for or awarded any person[al] decorations." Defense counsel noted for the record that Swisher was "wearing a Purple Heart on the witness stand, in the presence of the jury."

Still at the sidebar, the prosecutor responded that he never asked Swisher about "winning medals or combat" and had merely asked about "a conversation that [Swisher] had with Mr. Hinkson and what Mr. Hinkson asked him about." The prosecutor did not mention that three days earlier, in his opening statement to the jury, he had stated as a fact that Swisher was a combat veteran from the Korean War. The prosecutor also stated at the sidebar, "For the record, he has a little — I don't know — you know, something stuck in his lapel. If somebody knows what that is, fine. No one has said what it is."

The court permitted the defense to reopen its cross examination of Swisher in order to ask about Swisher's lapel pin and about his service during the Korean War. In response to

defense counsel's questions, Swisher testified that he was wearing "a Purple Heart Medal" that had been awarded to him by the U.S. government. He then explained that he had served in combat "[n]ot in the Korean War but following the Korean War." He said, "I was part of a special expedition, Marine Corps Expeditionary Unit that was engaged in combat after the Armistice, in an attempt to free POWs still in secret prison camps in North Korea. And that information still remains classified, so I'm not sure how much more I can say on that."

Over the prosecutor's objection, defense counsel then showed Swisher the just-received letter from the National Personnel Records Center. The letter was dated the day of the cross examination and had been faxed to defense counsel's office at 2:34 p.m. that afternoon. The letter was signed by Archives Technician Bruce R. Tolbert. The letter (hereinafter the "Tolbert letter") stated:

> [A] U.S. Marine Corps record was located on file at this Center for Mr. Swisher based on the information provided in your request. The USMC record shows Mr. Swisher served on active duty in the USMC from August 4, 1954 to his release from active duty on August 3, 1957. He was subsequently discharged from the USMC reserves on August 3, 1962. In addition, Mr. Swisher's Marine Corps record has been carefully examined by the Military Awards Branch of the office of the Commandant of the Marine Corps, and that office has stated that his record fails to show that he was ever recommended for, or awarded any personal decorations.

Defense counsel asked Swisher whether the letter "might refresh [his] recollection as to whether or not the Government issued [him] a Purple Heart."

After Swisher reviewed the letter, the following exchange took place:

Q [by defense counsel]: Now, sir, when you are awarded a Purple Heart, are you not given a document reflecting your entitlement to that Purple Heart?

A [by Swisher]: Commonly.

Q: Were you given such a document?

A: Yes.

Q: Where is that document?

A: In my pocket.

Q: May I see it, please?

A: I have a replacement DD-214, if the court will permit me to —

THE COURT: Let me take a look at it, first.

THE WITNESS: It is certified. We had to go clear to Headquarters of the Marine Corps and all over to get it. Because of the classifications, my record, along with the other survivors of that Mission, had been pretty much purged.

THE COURT: Ms. Longstreet, would you tender that to both counsel, please?

[THE PROSECUTOR]: I have a copy, Your Honor.

THE COURT: Just hang on to it.

[DEFENSE COUNSEL]: What was that?

[THE PROSECUTOR]: I have a copy.

[DEFENSE COUNSEL]: May we approach, Your Honor?

At sidebar, out of the hearing of the jury, the exchange continued:

[DEFENSE COUNSEL]: I am going to — apparently, counsel for the government knew about the validity of the Purple Heart. He just said he has a copy of this.

THE COURT: Have you seen this document?

[THE PROSECUTOR]: He showed me this document this morning, about 9:00 o'clock.

THE COURT: Do you have a copy of it?

[THE PROSECUTOR]: I have a copy of it.

[DEFENSE COUNSEL]: Why didn't you tell us?

[THE PROSECUTOR]: Why should I?

Swisher had pulled from his pocket a single sheet of paper, which was a photocopy of a document purporting to be a Defense Department Form 214, described by Swisher in his testimony as a "replacement DD-214." In box 32, near the bottom of the document, was typewritten: "This document replaces the previously issued transfer document of 8-3-57. Changes and additions have been verified by Command. The original of this DD-214 has been forwarded to headquarters MC (10-15-57) . . . . Entitled to wear Marine Corps Expeditionary Medal." Near the middle of the document, in box 26, was typewritten: "SILVER STAR, NAVY AND MARINE CORPS MEDAL W/ GOLD STAR, PURPLE HEART,

NAVY AND MARINE CORPS COMMENDATION MEDAL W/ BRONZE 'V'." In box 27, immediately below, was typewritten: "Multiple shrapnel and gunshot — September 1955, Korea." The document bore the signature "W. J. WOODRING, Jr., Capt., USMC."

On the same page, below the photocopy of the purported Form DD-214, was written: "Filed and recorded at the request of *Joe Swisher*[.] At *2:40* o'clock *p.*m. this *2nd* day of *February* 20*04*[.] *ROSE E. GEHRING*[,] Ex-Officio Auditor and Recorder Idaho County, Idaho[.] By *Dana Stroop*[,] Deputy[.] Fee $*0*[,] *1 pg.*" (Underlining indicates handwriting; italics indicates stamp; brackets indicate material added by this court.)

The court excused the jury, and the conversation continued. The court asked the prosecutor to confirm that he had seen the document that morning at 9:00 a.m. The prosecutor replied:

> [Swisher] showed it to me at 9:00 a.m. this morning because I had asked — he had mentioned Korea, serving in Korea.
>
> I said, "Wasn't the Armistice in '52?"
>
> He said, "But there was still, you know, combat; and it continues to this day," which I happen to know to be true. There is combat to this day in Korea.

Defense counsel requested a mistrial based on the prosecutor's failure to inform the defense that Swisher had given the government a document that appeared to contradict the letter from the National Personnel Records Center. The prosecutor responded that defense counsel "should have listened to me when I said, 'Don't go there.' " He elaborated:

I didn't go into anything about his combat or his medals or anything else on my direct. He chose to go down this path, even when I objected to it.

I didn't draw attention to the little pin in Mr. Swisher's lapel. Lots of people wear them. They could be anything. He wanted to make an issue of it.

. . . .

Counsel whipped out his document that he received minutes ago. I believe he probably didn't have enough time to read it and digest it and tried to use that to impeach the witness. That was improper.

. . . .

It was a grandstand play in front of the jury that didn't — that wasn't so grand, and he got caught on it. That's where we are.

There is nothing the Government did that caused him to go in the area he did. We tried to avoid going into this area.

I don't think —you know, I barely had time to look at this myself. It refers to other — that this replaces some document previously issued. I don't know what that document is, and it just led me to conclude that this is not a proper area to go into.

The court denied the motion for a mistrial:

The court finds as a matter of fact that if [Swisher's document] is a copy of a genuine military record — and at this point, I don't have any way to determine that; but it appears to be genuine, at least in appearance.

It indicates consistently with how the witness has testified; that he did, in fact, receive multiple shrapnel and gunshot wounds in September 1955 in Korea; and that he was awarded commendations and medals, including the Purple Heart.

The court stated that "until the receipt of the [Tolbert] letter," the government "had no reason to believe that [Swisher's document] was discloseable under Brady or Giglio because it was not impeaching."

The court offered to "instruct the jury to strike that portion of the cross examination of Mr. Swisher that relates to the Purple Heart. Just tell them to completely disregard all testimony about the Purple Heart." Defense counsel agreed. When the jury returned, the court said:

Ladies and gentlemen, it's been a long day; and I now realize that I made a mistake in allowing the questioning with regard to the Purple Heart Medal.

So I am going to instruct you to disregard completely all of Mr. Swisher's testimony with regard to that military commendation.

You are certainly entitled to consider all of the rest of his testimony. Just everything from where I asked [defense counsel] to re-open, please strike that from your minds; and you are not to consider it as evidence in the case.

The contretemps over the Tolbert letter and the "replacement DD-214" took place on Friday afternoon, January 14. The following Monday, January 17, was a federal holiday. When the trial resumed on Tuesday, the prosecution rested, and the defense called its first witnesses.

The next day, Wednesday, January 19, defense counsel told the court, outside the presence of the jury, that he had

obtained information suggesting that the document Swisher had taken from his pocket while on the witness stand — the "replacement DD-214" — was fraudulent. Defense counsel had obtained a photocopy of a different Form DD-214, also recorded by Swisher at the Idaho County Auditor and Recorder's office. However, this Form DD-214 had been recorded in February 2001 rather than February 2004. The earlier-recorded Form DD-214 was identical to the later-recorded form, with the notable difference that none of the medals, commendations, or wounds was mentioned in the earlier-recorded form. "N/A" was written in box 26 where the Silver Star, Purple Heart, and other awards were specified in the later-recorded form. "N/A" was also written in boxes 27 and 32 where, in the later-recorded form, "Multiple shrapnel and gunshot — September 1955, Korea" and "Entitled to wear Marine Corps Expeditionary Medal" were written.

Defense counsel told the court:

> [T]he indications from the people we have talked to [at the National Personnel Records Center] is that they stand by the [Tolbert] letter of January 14th and that they will provide us with a certified copy of his DD-214 that would not support [Swisher's document]; that [Swisher's document] is a forgery; and that he was never given any of the awards or benefits as indicated on [Swisher's document]; and that, further, if any change had been made in the discharge document, it would have been done on a form DD-215 [rather than a form DD-214] . . . .

Counsel further stated that he believed Swisher had not been wounded in combat but, in fact, had been "injured while in the Service in a car accident in Bremerton, Washington." He stated that the National Personnel Records Center would send Swisher's full military record to the court, but only in response to a subpoena signed by the court. The court signed a subpoena late that day.

Two days later, on Friday morning, January 21, again outside the presence of the jury, the prosecutor provided a photocopy of a letter to the court "for in-camera review." The letter was from Lieutenant Colonel K.G. Dowling, Assistant Head of the Military Awards Branch of the Marine Corps, to Ben Keeley of the Idaho Division of Veterans Services. The letter (the "Dowling letter") was dated December 30, 2004. What appeared to be a "received" stamp was dated January 10, 2005. At the top of the letter was a fax line, indicating that it had been faxed from the "ID. STATE VETERANS SVS" in Lewiston, Idaho, where Keeley's office was located, on Thursday, January 13, 2005. January 13 was the day before Swisher took the stand to testify against Hinkson.

The prosecution has given various answers about when it received the Dowling letter or learned of its existence. On the morning of January 21, when he gave the letter to the district court, the prosecutor stated that he "believe[d] Agent Long got [the letter] the day before by going to the Veterans' Administration." Later, in its opposition to Hinkson's motion for a new trial, the prosecution stated in its brief that the letter was "obtained by federal investigators a few days earlier from the Boise Veteran's Affairs office." In its brief to this court, the prosecution stated that "government investigators obtained [the letter] on or about January 20." Finally, in response to our queries during oral argument, the government's attorney sent us a post-argument letter stating that he had "been informed that investigating agents on the prosecution team first saw and learned of the Dowling letter on January 18 or 19, at the Boise, Idaho office of the Department of Veteran's Affairs." (Emphasis added.) There is no indication in the record that defense counsel had any idea of the existence of the Dowling letter until the government provided it to the court on January 21.

The Dowling letter indicated that Keeley had earlier contacted the Personnel Management Support Branch of Marine Corps Headquarters, after Swisher attempted to use his "re-

placement DD-214" to obtain veterans' benefits from the Idaho Division of Veterans Services. Dowling wrote back to Keeley:

> We have thoroughly reviewed the copy of the Certificate of Release or Discharge from Active Duty (DD Form 214) and supporting letter which you submitted on behalf of Mr. Swisher with your request. The documents you provided do not exist in Mr. Swisher's official file. The official DD Form 214 in his record of the same date was signed by Mr. Swisher and does not contain any awards information in box 26, and contains no "wounds" information in box 27. A copy of his official DD 214 is provided as the enclosure. Given this information we have reason to believe that the documents you submitted are not authentic.

> Specifically, the DD 214 you submitted on behalf of Mr. Swisher indicates that Mr. Swisher is entitled to the Silver Star Medal, Navy and Marine Corps Medal (Gold Star in lieu of the Second Award), Purple Heart, and Navy and Marine Corps Commendation Medal with Combat "V." However, our review of his official military records, those of this headquarters, and the Navy Department Board of Decorations and Medals failed to reveal any information that would indicate that he was ever recommended for, or awarded any personal decoration.

> Additionally, the Navy and Marine Corps Commendation Medal, which is listed in block 26 of the DD 214 that you submitted did not exist at the time of Mr. Swisher's transfer to the Marine Corps Reserve in 1957. On March 22, 1950, a Metal Pendant was authorized for issue in connection with a Letter of Commendation and commendation ribbon. On September 21, 1960, the Secretary of the Navy

changed the name of the award to the Navy Commendation Medal. On August 19, 1994, the Secretary of the Navy renamed the medal as the Navy and Marine Corps Commendation Medal. It is impossible that the approving officer could have signed an official document in 1957 indicating Mr. Swisher's entitlement to a personal decoration which did not exist in its present form until 1994.

Further review of Mr. Swisher's records reveals that he is not entitled to any service awards, including the Marine Corps Expeditionary Medal, for his service in the U.S. Marine Corps. Mr. Swisher's official military records failed to indicate any information that he served in Korea during the period when any awards were authorized. His records show that he was stationed at Camp Fuji and Yokosuka, Japan from March 4, 1955 to May 6, 1956.

There is no information in his military record or his medical record to substantiate his entitlement to a Purple Heart medal. His medical records show that on February 10, 1957, he was involved in a private vehicle accident near Port Townsend, Washington.

Later that same day, the court received Swisher's official military file — "a half-inch-thick stack of materials" — from the National Personnel Records Center in response to its subpoena. The official military file contained a copy of the Dowling letter. Its presence in the file was not surprising, for the Dowling letter stated in its last paragraph: "[Mr. Swisher's] records will be returned to the National Personnel Records Center, and a copy of this letter will be filed in Mr. Swisher's official military records." The file also contained a copy of Swisher's original Form DD-214. This Form DD-214 matched precisely the Form DD-214 that Swisher registered in the Idaho County Recorder's office in February 2001.

The official file also contained the two documents that Keeley had sent to Dowling for evaluation. One of the documents was a copy of the "replacement DD-214" purportedly signed by Capt. W. J. Woodring, Jr., that Swisher had pulled out of his pocket on the witness stand. The other document was a letter purportedly written to Swisher by Woodring on October 16, 1957. That letter stated:

I am pleased to inform you that your combat action, awards and citations have been verified. A copy of a replacement DD 214 transfer document, which more accurately reflects your military service, is attached to this correspondence. The original has been forwarded to the Commandant of the Marine Corps at Headquarters Marine Corps in Washington, D.C.

. . . .

When you recover from surgery, both Major Morgan and I encourage you to enter a R.O.T.C. program at the college of your choice. Glad we were able to help.

As indicated above, the Dowling letter stated that "we have reason to believe" that both of these documents "are not authentic."

Outside the presence of the jury, the court stated that a "quick review of the file indicates that Mr. Swisher was, in fact, involved in top secret activities; and it appears that he was awarded the medals that he claims that he was awarded. . . . [The documents] do not appear to be impeaching." The court told counsel that it would conduct a more thorough review of the file over the weekend.

When the trial reconvened on Monday, January 24, the court went through Swisher's official military file with coun-

sel off the record. Then, on the record and without the jury present, the court stated its conclusions. The file had been sent to the court by the National Personnel Records Center in response to the court's subpoena; the Dowling letter in the file matched the letter provided to the court by the prosecution on Friday; and the Dowling letter concluded that the "replacement DD-214" and the "supporting letter" purportedly signed by Woodring were "not authentic." But the court found the file "very difficult to decipher." The court stated:

> It is not at all clear to me what the truth of the matter is; and I suspect it has something to do with the fact that we are dealing with events that occurred fifty years ago and that, at the time that they occurred, were involving top secret military activities.

> So I wanted you to look at it because, obviously, you have to make your own judgment as to what you think the significance of it is.

The court stated that "the problem the court had in reviewing the documents in camera is that the documents we have, themselves, are neither self-authenticating nor self-explanatory."

The court concluded:

> And I do not want to turn this issue into a peripheral mini-trial under Rule 608(b) of the Rules of Evidence.

> . . . .

> So the state of the record at this point before the jury is that the jury is not to consider Mr. Swisher's battlefield commendations, or lack thereof, although they can certainly assess his credibility with regard

to the extensive cross-examination that was con-
ducted by the defense and see how it jives with all
of the other evidence in the case.

Defense counsel replied that, in light of the information now
before the court, the defense deserved an opportunity to ques-
tion Swisher further about his "replacement DD-214" and his
military experience. Counsel reiterated that Swisher had worn
a Purple Heart on the witness stand.

The prosecutor reminded the court that during his direct
examination of Swisher he had not attempted to elicit "for the
truth of the matter that Swisher was, indeed, in combat."
Instead, he said, the jury heard about "a conversation . . .
between Mr. Swisher and Mr. Hinkson regarding Hinkson
asking him, 'Were you ever in combat?' " The prosecutor also
addressed "what we call a Replica Purple Heart. It's not a real
Purple Heart at all." The basis of the prosecutor's conclusion
that the lapel pin Swisher wore on the witness stand was "not
a real Purple Heart at all" is not clear from the record. The
prosecutor maintained to the court that, in any event, whether
Swisher was "entitled to wear a Replica Purple Heart or any
other kind of little medal on his lapel" was a "collateral issue
that arose only on cross-examination."

Defense counsel told the court that he was "concerned
about when the Government got [the Dowling letter]," which
the prosecutor had provided to the court on Friday morning,
January 21. The prosecutor responded, "[W]e got it — I
believe Agent Long got it the day before by going to the Vet-
erans' Administration." The prosecutor added that the Dow-
ling letter, standing alone, did not prove that Swisher's
"replacement DD 214" was fraudulent. He said:

> What they would really have to prove, if this were
> to be resolved, is they would have to prove that the
> substitute DD-214 signed by Captain Woodring, in,
> I believe, October '57 — . . . that the signature of

Captain Woodring was forged; and I would suggest that probably would resolve whether it's correct or not.

How you would prove that something that was signed in 1957 — I doubt very much Mr. Woodring is still with us, but I don't know.

The court agreed that it "was not at all convinced yet" that "the document that Mr. Swisher pulled out of his pocket [was] false or not" because Swisher's military record was not "self explanatory." The court stated, "I have no idea, if somebody is involved in secret military operations, whether or not their personnel file . . . would ever reflect those missions." The court stated that it needed to hear from "a records custodian from the National Personnel Records Center or someone else who is more familiar with military records and decorations than any of us."

The court ruled that the defense would be permitted to recall Swisher for further cross examination but would not be permitted to introduce any of the documents bearing on his military experience:

The documents which form the basis for the doubt cast on Swisher's military record and [his] entitlement to wear the Purple Heart are extrinsic evidence probative of a specific incident of untruthfulness.

The court therefore holds that the admission of these documents is barred by Rule 608(b).

. . . .

The proffered documents state, in summation, that Swisher's record does not indicate that he earned any service record or service medals during his military duty; however, other documents available to the

court suggest that Swisher might, indeed, have earned such medals.

. . . .

The defense may reference these documents during its cross-examination. . . .

In sum, the court finds that the questionability of Swisher's character for truthfulness may be amply demonstrated to the jury by re-opening cross-examination and by allowing the defense to reference the impeaching documents during the cross-examination.

. . . .

. . . . I will let the defense decide which way they want to go; either leave it alone or call him.

The next morning, defense counsel informed the court that, under the conditions imposed by the court, he had decided not to recall Swisher.

The government made several references to Swisher's military experience during closing arguments to the jury. The prosecutor began by explaining the significance of Swisher's testimony:

The judge will further instruct you that the fourth sort of circumstance that you can consider to be strongly corroborative of Mr. Hinkson's intent to solicit murder would be the fact that an accused believed or was aware that the person solicited had previously committed similar offenses.

Mr. Swisher's testimony was powerful. He talked about how Mr. Hinkson understood that Mr. Swisher

> had been in the military and had killed a lot of people. He was very impressed by that.
>
> In fact, according to Mr. Swisher, Mr. Hinkson asked, "Have you killed somebody?"
>
> And when Mr. Swisher says, "Yes," Mr. Hinkson's response is not, "Wow, that must be terrible," but it is, "How many people have you killed?" He was very impressed by that.

The prosecutor stated that "[a]nother reason Mr. Hinkson liked Joe Swisher and they were friends is Mr. Swisher had been in the Marine Corps. Mr. Hinkson had served in the Navy. Joe Swisher told you they talked about their experiences in the Service." The prosecutor stated later, "Mr. Swisher, I suggest to you a reasonable juror could find, told the truth about the solicitation." At the end of the government's closing, the prosecutor stated that Hinkson "understood Mr. Swisher had a military record and that he had served in combat and killed people. It's the kind of person he thinks will do such a thing."

On January 27, 2005, after two days of deliberations, the jury returned a guilty verdict on the Swisher-related solicitation counts. Just over a month later, on March 3, 2005, defense counsel moved for a new trial pursuant to Federal Rule of Criminal Procedure 33 on a number of grounds. *Inter alia*, the motion relied on "newly discovered evidence" that Swisher had produced a forged document in court and had lied under oath on the witness stand. That evidence consisted of an affidavit from Chief Warrant Officer W.E. Miller, the Marine Corps liaison to the National Personnel Records Center, and an affidavit from now-retired Colonel W.J. Woodring, Jr., the Marine Corps officer whose signature appeared on Swisher's original Form DD-214, on the purported "replacement DD-214," and on the purported "supporting letter" for the "replacement DD-214."

Chief Warrant Officer Miller stated, in an affidavit dated February 24, 2005, "As part of my duties . . . I have access to the official United States military records of former members of the USMC which are deposited in the N[ational] P[ersonnel] R[ecords] C[enter] and, among my other responsibilities, I evaluate the authenticity of information, records and documents affecting individual Defense Department transfer documents including DD Forms 214."

Miller concluded that Swisher had never been awarded a Purple Heart. He wrote that his reasons included the following:

    A.   Swisher's medical records show that he did not sustain any combat wounds, rather he was involved in a private motor vehicle accident near Port Townsend, Washington on 10 February 1957 and was treated at the hospital at Bremerton, Washington. . . .

    B.   The DD Form 214 signed by Swisher on 3 August 1957 . . . which is a part of his official U.S. military record contains a specification that he was not entitled to VA benefits[.]

    C.   Swisher's official U.S. military record indicates that he was subject to an Article 115 disciplinary action resulting in demotion from Corporal to Private First Class on 28 Feb. 56 which involved disobedience to military law during his active tour of duty[.]

    D.   Swisher's official U.S. military record shows that rather than being assigned to missions in post-War Korea (as claimed by Swisher) he was stationed at Camp Fuji and Yokosuka, Japan from 4 March to 6 May 1956 with no supporting documentation or information to indicate

that he participated in any classified Marine
Corps expeditionary operation that performed
incursions into Korea during his tour of active
duty. . . .

E.  Swisher asserts that the expeditionary missions
he was involved with in Korea were classified
as "Top Secret" operations. The U.S. Marine
Corps did not perform any classified operations
or "Top Secret" operations during Swisher's
tour of duty.

Miller also concluded that the "replacement DD-214" that
Swisher had presented in court was not an "authentic docu-
ment." (Miller referred to this document as "Exhibit C.") In
addition to the factors enumerated in support of his conclu-
sion that Swisher was not entitled to a Purple Heart, Miller
wrote:

A.  Military Rules and Procedures require that a
DD Form 214 can only be issued and retyped at
the Headquarters of the USMC and signed by a
designee of the Commandant of the Marine
Corps who offices at Headquarters. Capt. Woo-
dring never held such designation.

B.  Exhibit C, in box 32 provides: "*[t]his document
replaces the previously issued transfer docu-
ment of 8 3-57*." There are no additional records
in Swisher's file that support the claim that
Swisher's original DD Form 214 was replaced;

C.  Exhibit C, box 32, provides: "*[c]hanges and
additions have been verified by Command*."
Changes or additions in Swisher's original DD
Form 214 if truly "*verified by Command*" would
have resulted in verification documents becom-
ing a part of Swisher's official U.S. military

record. . . .

. . . .

G.  Military policy and procedure which has been
    in effect since before the time of Swisher's
    transfer from active duty to the USMC Reserves
    on 3 Aug. 57 would have directed the issuance
    of a DD Form 215 first, before any replacement
    version of Swisher's original DD Form 214
    would have been issued. . . .

H.  There is no record of a DD Form 215 ever hav-
    ing been issued for Swisher.

(Emphasis and brackets in original.)

Now-retired Marine Corps Colonel W.J. Woodring, Jr., in
an affidavit dated February 27, 2005, stated:

2.  I spent 35 years 6 months in the United States
    Marine Corps. I was a Captain in the Marine
    Corps in 1957. I am now retired and I reside in
    Southern California.

3.  I have reviewed Exhibit A attached which pur-
    ports to be a copy of a letter addressed to Pfc
    Elven Joe Swisher (Swisher) dated 16 Oct 1957.
    I did not write or cause Exhibit A to be written.
    Below the words Semper Fidelis, there is hand-
    writing that purports to be my signature. I did
    not sign Exhibit A. What looks like my signa-
    ture on Exhibit A is actually the image of my
    signature that has somehow been superimposed
    upon the letter. Exhibit A is a forgery.

4.  I have reviewed Exhibit B attached which pur-
    ports to be a copy of a "Replacement DD 214"

for Swisher. In box 34b there is handwriting that purports to be my signature. I did not sign Exhibit B. What looks like my signature on Exhibit B is actually the image of my signature that has somehow been superimposed upon the letter. Exhibit B is a forgery.

On April 22, 2005, the court denied Hinkson's motion for a new trial. Applying the criteria set forth in *United States v. Waggoner*, 339 F.3d 915, 919 (9th Cir. 2003), the court gave several reasons for declining to grant a new trial on the basis of newly discovered evidence. First, the court concluded that Hinkson had not been diligent in seeking the evidence he now submitted to the court. Second, the court concluded that the evidence was not "newly discovered" because "[t]he substance of both proffered documents is not new and is generally cumulative of previously available information." Finally, "[m]ost importantly," the court concluded that "the proffered 'new' evidence is not material to the issue at trial, nor would a new trial probably result in an acquittal, because the evidence is inadmissible." The court explained that it had "previously held on the record at trial . . . and now reiterates, admission of the proffered documents and testimony is still prohibited by Fed. R. Evid. 608(b), which bars introducing extrinsic evidence of the witness's past conduct."

Hinkson was sentenced on June 3, 2005, for his solicitation convictions as well as for his tax evasion and currency structuring convictions. He received a total of 43 years in prison: ten years on the tax and structuring charges, ten years on each of the three solicitation charges, and an additional three years for having made the solicitations while on pretrial release in the tax case.

II.   Subsequent Indictment and Conviction of Swisher

On July 30, 2007, the government indicted Swisher for knowingly wearing military decorations to which he was not

entitled, including the Purple Heart, in violation of 18 U.S.C. § 704(a); for willfully and knowingly making false representations about his military service in order to obtain benefits to which he was not entitled, in violation of 18 U.S.C. §§ 1001(a)(2) and 1001(a)(3); and for presenting false testimony and a "forged form DD-214" in order to obtain benefits to which he was not entitled, in violation of 18 U.S.C. §§ 641 and 642. As the date of the indictment makes clear, the government indicted Swisher more than two years after the district court ruled on Hinkson's motion for a new trial. On April 11, 2008, Swisher was convicted on all three counts of the indictment.

Because Swisher's indictment and conviction did not come down until after the district court ruled on Hinkson's motion for a new trial, the district court obviously could not have considered them in reaching its decision. We also do not consider them in reaching our decision today.

### III. Motion for New Trial

On appeal to this court, Hinkson moves for a new trial based on three arguments. First, Hinkson argues that the district court erred in precluding him from introducing evidence to show that Swisher lied about his military record and forged his replacement DD-214. Second, Hinkson argues that the prosecution engaged in misconduct by referring to Swisher's military background during its closing argument despite the doubts that had been raised about the veracity of Swisher's testimony. Third, Hinkson argues that he is entitled to a new trial, because, based on the new evidence, it is now undisputed that Swisher proffered a forged document and testified falsely in court. We reach only the third argument.

Hinkson's motion for a new trial asserted that the Miller and Woodring affidavits proved conclusively that Swisher had presented a forged document and had lied under oath. The government does not now dispute that the "replacement DD-

214" was forged and that Swisher lied about his military experience. It contends, however, that Hinkson has not satisfied the standard for obtaining a new trial.

We review a district court's denial of a motion for a new trial based upon newly discovered evidence for abuse of discretion. *See, e.g.*, *United States v. Sarno*, 73 F.3d 1470, 1507 (9th Cir. 1995). A district court abuses its discretion when it makes an error of law, when it rests its decision on clearly erroneous findings of fact, or when we are left with "a definite and firm conviction that the district court committed a clear error of judgment." *Delay v. Gordon*, 475 F.3d 1039, 1043 (9th Cir. 2007) (internal quotation marks omitted).

**[1]** Under *United States v. Harrington*, 410 F.3d 598 (9th Cir. 2005), a criminal defendant must satisfy a five-part test in order to prevail on a motion for a new trial:

> (1) [T]he evidence must be newly discovered; (2) the failure to discover the evidence sooner must not be the result of a lack of diligence on the defendant's part; (3) the evidence must be material to the issues at trial; (4) the evidence must be neither cumulative nor merely impeaching; and (5) the evidence must indicate that a new trial would probably result in acquittal.

*Id.* at 601 (quoting *United States v. Kulczyk*, 931 F.2d 542, 548 (9th Cir. 1991)). The district court applied this *Harrington* test, citing *Waggoner*, 339 F.3d at 919.

What we today call the *Harrington* test is sometimes referred to as the "*Berry* rule," named for the nineteenth-century case from which it derives. *See* 3 Charles Alan Wright et al., *Federal Practice and Procedure* § 557, at 541 (3d ed. 2004) (citing *Berry v. State*, 10 Ga. 511, 527 (1851)). Although we ordinarily state the test as comprising five requirements, we have recognized that requirements (3), (4),

and (5) are duplicative. That is, newly discovered evidence is "material" when the result of the newly discovered evidence is that "a new trial would probably result in acquittal," a condition that is not usually met when the newly discovered evidence is "cumulative [ ]or merely impeaching." *See, e.g.*, *United States v. Krasny*, 607 F.2d 840, 845 n.3 (9th Cir. 1979) (noting that the materiality and probability requirements "are really two means of measuring the same thing"); *United States v. Davila*, 428 F.2d 465, 466 (9th Cir. 1970) (per curiam) (noting that newly discovered impeachment evidence supports a new trial if "it is likely that the jury would have reached a different result" in light of the evidence); *see also* Wright et al., *supra*, § 557, at 552.

**[2]** The character of the defendant's newly discovered evidence determines how strictly we apply the *Harrington* test's probability requirement. Our usual rule is that newly discovered evidence does not entitle a defendant to a new trial unless the evidence indicates that it is more probable than not that the new trial will result in acquittal. This rule applies to most newly discovered evidence, including newly discovered evidence suggesting that evidence presented at the defendant's trial may have been false. *See Krasny*, 607 F.2d at 842.[1]

We conclude that Hinkson has satisfied all five parts of the *Harrington* test. The dissent concludes that Hinkson has satisfied *none* of them. In form, the dissent is in two parts. The first part discusses the likelihood that a new trial will result in an acquittal. Diss. at 6169-74. The second part discusses the five *Harrington* requirements. *Id.* at 6174-83. Because the likelihood of an acquittal on retrial is the fifth *Harrington*

---

[1]We have sometimes applied a less demanding standard for granting a new trial where it is known conclusively at the time of the new trial motion that the evidence presented at trial was false. *See Hall v. Director of Corrections*, 343 F.3d 976 (9th Cir. 2003); *Killian v. Poole*, 282 F.3d 1204 (9th Cir. 2002); *United States v. Young*, 17 F.3d 1201 (9th Cir. 1994). Because we hold that Swisher is entitled to a new trial under the *Harrington* test, it is unnecessary to apply this test.

requirement, we respond to the first part of the dissent in our discussion of that fifth requirement.

### A.   Newly Discovered Evidence

**[3]** Under the first part of the *Harrington* test, we must determine whether the evidence presented in support of the motion for a new trial is "newly discovered." Hinkson's new trial motion relied on two new pieces of evidence: (1) the affidavit from Chief Warrant Officer Miller, the Marine Corps liaison to the National Personnel Records Center; and (2) the affidavit from Colonel Woodring, the officer whose purported signature appeared on Swisher's "replacement DD-214" and "supporting letter." It is undisputed that neither piece of evidence was known to or in the possession of the defense (or the government) until after Hinkson's trial had concluded. This evidence thus qualifies as "newly discovered."

The dissent disagrees. It concedes that both the Miller affidavit and the Woodring affidavit are newly discovered evidence, stating that "it goes without saying" that "they were not procured until *after* trial." Diss. at 6176-77 (emphasis in original). But the dissent contends that this is a "superficial analysis" because "[a]s the district court noted, 'the substance of both proffered documents is not new.' " *Id.* In contending that the "substance" of the new documents is not new, the dissent is contending that their substance was already known. In other words, the dissent is saying that the evidence contained in the documents is merely cumulative of evidence that was already known. That argument is properly addressed to the third Harrington requirement. We address that argument in detail below. We respond only briefly here.

**[4]** The dissent's contention would be more persuasive if the district court had not clearly indicated during trial that, in its view, the existing evidence was insufficient to show that Swisher had lied about his military record and awards. After reading the half-inch-thick file received on January 21 from

the National Personnel Records Center, the district court concluded, "It is not at all clear to me what the truth of the matter is[.]" The court indicated that the file was "very difficult to decipher" and not "self-explanatory." It concluded by saying that it could not resolve its uncertainty without "hearing from" a military "records custodian" or similar person. The prosecutor added that what was needed in order to show the falsity of the "replacement DD-214" was an affidavit from Colonel Woodring stating that his signature had been forged.

**[5]** As we will discuss in more detail below, the proffered documents — the Miller and Woodring affidavits — were precisely the evidence that the district court and the prosecutor on January 21 had described as fatally lacking. The Miller affidavit provided precisely the explanation the district court had said it needed to "decipher" the documents in Swisher's file. The Woodring affidavit was precisely the evidence the prosecutor had said was needed to prove the falsity of the replacement DD-214. Given this background, it is impossible to conclude that the "substance" of the Miller and Woodring affidavits was not new.

## B.   Diligence

Under the second part of the *Harrington* test, we ask whether the failure to discover the evidence sooner resulted from a "lack of diligence on the defendant's part." *See Kulczyk*, 931 F.2d at 548. A court cannot conclude that a defendant lacks diligence merely because a defense team with unlimited time and resources might have managed to discover the evidence sooner. Instead, mindful of the constraints and competing pressures on the defense before and during trial, a court asks whether it was unreasonable for the defense to have failed to discover the evidence more promptly. "All that is required is ordinary diligence, not the highest degree of diligence." 3 Wright et al., *supra*, § 557, at 559-60.

The district court concluded that Hinkson had not been sufficiently diligent in discovering the new evidence. It wrote,

"[T]he Court finds that Defendant is unable to establish that the failure to discover this evidence was not due to his counsel's lack of diligence. . . . [T]he Court finds that defense counsel had ample time to investigate Swisher's record prior to trial, but was not diligent in pursuing the issue."

In support of its conclusion that Hinkson had not been diligent, the district court pointed out that Swisher had testified to receiving "battlefield injuries" from his military service during an October 11, 2004, deposition in a civil suit involving Swisher and Hinkson. Hinkson was represented in that suit by Wesley Hoyt, one of the two attorneys representing him in his criminal case. In further support of its conclusion, the district court pointed out that Swisher had discussed his purported war injuries in grand jury testimony on April 16, 2002, and February 10, 2004.

Swisher's deposition in the civil case took place just three months before the start of Hinkson's criminal trial. That was the first time Hinkson was put on notice of Swisher's claimed "battlefield injuries." It is true, as the district court wrote, that Swisher gave grand jury testimony in 2002 and early 2004. But the district court was wrong to rely on the dates of the grand jury testimony. The *government* knew about Swisher's grand jury testimony, and thus the government was put on notice in 2002 and 2004 of his claimed "battlefield injuries." However, precisely because it was grand jury testimony, that testimony was kept from Hinkson. The government finally turned Swisher's grand jury testimony over to Hinkson pursuant to the Jencks Act. It did so on January 4, 2005, one week before trial.

[6] On January 14, when defense counsel sought to reopen his cross examination of Swisher in order to question him about the Tolbert letter, counsel stated to the court, "For quite some time, we have been trying to dig into his military history because we don't believe it's accurate." Then, after Swisher pulled the "replacement DD-214" out his pocket, defense

counsel stated at the sidebar that the defense had "been trying to get Mr. Swisher's military records *for about ninety days*; and we have very little control over when that happens." (Emphasis added.) Thus, we know from the trial transcript that the defense began to look into Swisher's military record immediately after his deposition. We also know that government military authorities, over whom defense counsel had "very little control," had been slow to respond.

**[7]** In our view, defense counsel were diligent in looking for evidence that could be used to impeach Swisher. Indeed, counsel were successful in finding such evidence. As a result of their efforts, defense counsel received the Tolbert letter from the National Personnel Records Center while Swisher was still on the stand. The letter recounted that Swisher did not enter active duty until 1954. It stated that "Swisher's Marine Corps record has been carefully examined by the Military Awards Branch . . . , and that office has stated that his record fails to show that he was ever recommended for or awarded any personal decorations."

Defense counsel reasonably viewed the Tolbert letter as exactly the sort of impeaching evidence it had been seeking. Counsel hoped that Swisher, when confronted with the letter, would be forced to admit that he was not the decorated combat veteran he purported to be. Counsel could hardly have anticipated that Swisher, after being shown the letter, would pull from his pocket a forged document purporting to provide a superseding account of his military service. Until that moment, there was little reason for the defense to suspect the existence of Swisher's "replacement DD-214," let alone to suspect that the document was a forgery.

After learning of the "replacement DD-214" on Friday, January 14, the defense was quick to investigate its authenticity. On Wednesday, January 19, following a long holiday weekend, defense counsel informed the court that they had learned that Swisher had recorded two different DD-214

forms with Idaho County, and that the earlier-recorded DD-214 was "devoid of any . . . honors and medals." Counsel also stated that they had spoken to staff at the National Personnel Records Center who stated that the Center stood by the conclusions of the Tolbert letter but would not release additional documents about Swisher without a subpoena from a judge. The court agreed to subpoena Swisher's military file, which arrived two days later, on Friday, January 21.

[8] The court kept Swisher's military file to review over the weekend, and then disclosed it to counsel on Monday, January 24, the last full day of testimony before closing arguments. The court ruled that it would allow the defense to recall Swisher for further cross examination, but would not allow the defense to introduce into evidence any of the military documents obtained. The court stated further that it did not want to conduct a mini-trial during which the government would put experts on the stand to explain the documents. Once Hinkson's trial concluded, the defense was diligent in obtaining the evidence from Woodring and Miller. It filed its motion for a new trial one month after trial. *See* Fed. R. Crim. P. 33(b)(1) (providing that motions for a new trial "grounded on newly discovered evidence must be filed within 3 *years* after the verdict" (emphasis added)).

Even though the government had its own duty to investigate Swisher's military record, having been alerted "of the real possibility of false testimony," *Bowie*, 243 F.3d at 1118, the government fared far worse than defense counsel. Because it had participated in the grand jury proceedings, the government knew long before defense counsel that Swisher had given inconsistent testimony about his military experience. Swisher's first grand jury testimony was in April 2002, more than two and a half years before Hinkson's trial. The government's suspicions eventually led to its discovery of the Dowling letter. Government prosecutors maintain that they did not obtain the Dowling letter until sometime shortly before they gave it to the court on the morning of January 21. So far as

the record shows, the government was never able to obtain expert analysis of Swisher's military file other than the Dowling letter and was never able to locate Colonel Woodring.

The defense's strategic decision not to recall Swisher to the stand for further cross examination at the end of the defense case does not alter our conclusion that defense counsel acted diligently. The diligence requirement is addressed to diligence in discovering evidence, not to strategic decisions about how to use evidence already in hand. But even if the diligence requirement were expanded to cover a strategic decision not to recall Swisher, we believe that defense counsel's decision was eminently sound. Under the conditions imposed by the district court, further cross examination of Swisher would not have helped the defense to uncover or to present to the jury evidence showing Swisher's fabrications. The district court's ruling precluded the defense from introducing into evidence any of the documents received by the court in response to its subpoena, including the Dowling letter. Having already been embarrassed once by Swisher, defense counsel was understandably reluctant to attempt another cross examination under the conditions imposed by the court. While the defense might possibly have managed to create some doubt in the mind of jurors about Swisher's truthfulness, there was a significant possibility that Swisher would have defended himself with additional fabrications, leaving the jury with the impression that the defense was making further unfounded attacks on a decorated war hero.

The dissent contends that the district court did not clearly err in finding that Hinkson was not sufficiently diligent in discovering the new evidence. The dissent would be on firmer ground if the district court had not relied on the fact that Swisher had mentioned his battlefield injuries during his grand jury testimony in 2002 and 2004. This was clear error by the district court. Because grand jury testimony is secret, Hinkson could not have known about it in 2002 and 2004. Only the government knew about it, and the government did

not reveal the grand jury testimony to Hinkson until a week before trial.

The dissent further contends that Hinkson was not diligent because he could have subpoenaed witnesses to testify at trial about Swisher's military record. This contention is fanciful. The district court made it quite clear that, in its view, the dispute over Swisher's military record concerned a collateral impeaching matter, and that Hinkson would not be permitted to introduce *anything* into evidence that would show that Swisher had lied about his military record, including documents from Swisher's official personnel file. It also stated clearly that it did not want government experts testifying about Swisher's records. If the district court would not allow into evidence documents from Swisher's personnel file because they addressed a collateral issue, and if it did not want testimony from government experts, it is obvious that it would not have permitted live testimony of defense experts on that same issue.

## C.   Material to the Issues at Trial

**[9]** The third part of the *Harrington* test requires that the newly discovered evidence be "material to the issues at trial." In the context of a new trial motion under *Harrington*, materiality has a special meaning. Materiality under *Harrington* does not require that the evidence in question would have been material at the original trial. Rather, materiality under *Harrington* requires that the evidence in question will materially alter the result on *retrial*. In many cases, there will be little or no practical difference. *See*, *e.g.*, *United States v. George*, 420 F.3d 991, 1001 (9th Cir. 2005) (analyzing materiality in terms of the first trial). But the *Harrington* test is clearly framed in terms of what will happen on retrial rather than what happened at the original trial. *See Harrington*, 410 F.3d at 601 ("[T]he evidence must indicate that a new trial would probably result in acquittal[.]"); *see also Krasny*, 607 F.2d at 844 ("Yet, we have always required a showing that the

new evidence would 'probably' result in an acquittal upon a new trial.") and 845 n.3 (explaining that materiality and probability "are really two means of measuring the same thing"). As we discuss below, in addressing *Harrington*'s fifth requirement, we conclude that the newly discovered evidence of Swisher's fabrications makes it probable that a new trial will result in acquittal. Thus, we also conclude that the new evidence is material under *Harrington*.

[10] Relying on *United States v. Davis*, 960 F.2d 820 (9th Cir. 1992), the dissent contends that the Miller and Woodring affidavits are not material because they address a "collateral issue." Diss. at 6181. Specifically, the dissent quotes from the following sentence in *Davis*: "Ordinarily, evidence impeaching a witness will not be material under *Walgren* [an earlier version of *Harrington*] because it will not refute an essential element of the government's case." *Davis*, 960 F.2d at 825. In the dissent's view, impeaching evidence is necessarily evidence that relates to a "collateral issue" and is therefore not material. However, we explicitly recognized in *Davis* that impeaching evidence can be material in a new trial motion. For example, we wrote, "[T]he newly discovered impeachment evidence may be so powerful that, if it were to be believed by the trier of fact, it would render the witness' testimony totally incredible." *Id.*

Further, the dissent relies on evidentiary rulings made by the district court. The dissent notes that the district court held that impeaching documents relating to Swisher's military record were inadmissible under Federal Rule of Evidence 608(b). The dissent further notes that the district court excluded the evidence under Rule 403. The dissent concludes, "These evidentiary rulings also undermine the defense's claim that impeachment of Swisher's military record will blossom into substantive evidence at a new trial." Diss. at 6183.

Although the district court's evidentiary ruling under Rule 403 was almost certainly not an abuse of discretion, its ruling

under Rule 608(b) was almost certainly legal error. Rule 608(b) forbids the introduction of extrinsic evidence for the purpose of attacking a witness's credibility. But evidence contradicting a witness's statement is not barred by Rule 608(b). If Swisher had not worn the Purple Heart pin onto the witness stand, the district court's ruling under Rule 608(b) would have been correct. But Swisher came onto the witness stand wearing a Purple Heart lapel pin, thereby indicating that he had been wounded in combat while serving in the United States armed forces. Under Rule 801(a), "[a] 'statement' is . . . nonverbal conduct of a person, if it is intended by the person as an assertion." In his opening statement to the jury, the prosecutor had described Swisher as a "combat veteran." Particularly given the prosecutor's statement, it is difficult to interpret Swisher's wearing of the Purple Heart as anything other than "nonverbal conduct . . . intended . . . as an assertion."

**[11]** The dissent appears to suggest that because the district court properly excluded the impeaching documents from evidence under Rules 608(b) and 403, these documents could have no material effect on retrial. Even if this were true (which it almost certainly is not with respect to Rule 608(b)), this is irrelevant under *Harrington*. The test under *Harrington* is not (to use the dissent's words) whether the newly discovered documents impeaching Swisher go to a "collateral issue"; not whether the documents were or would be "inadmissible extrinsic evidence" under Rule 608(b); and not whether the documents will "blossom into substantive evidence." The materiality test under *Harrington* is whether the newly discovered evidence — the Miller and Woodring affidavits — would probably result in acquittal on retrial.

**[12]** As we discuss in detail in part five of the *Harrington* test, we conclude that the Miller and Woodring affidavits indeed would probably result in acquittal on retrial. The affidavits would not even have to be admitted into evidence to have this effect. Now that both sides conclusively know the

truth, if Swisher is asked about his military record, and is asked whether he lied under oath about that record at the first trial, the truth will come out. Now that the truth is known, Swisher may decide to give a truthful answer. Or, if Swisher tries to lie again, the government will have a professional obligation to correct the record.

### D.    Neither Cumulative nor Merely Impeaching

The fourth part of the *Harrington* test requires that the new evidence be "neither cumulative nor merely impeaching."

### 1.    Cumulative

The district court concluded that "[t]he substance of both proffered documents is not new and is generally cumulative of previously available information." The "previously available information" to which the court referred are the documents that came to light at three different points during the trial: first, the Tolbert letter used by defense counsel to cross examine Swisher on January 14; second, the Dowling letter, which the prosecution gave to the court on the morning of January 21 and which the court also received later that day as part of Swisher's official military file; and third, the remainder of Swisher's official military file, which the court received on the afternoon of January 21.

During trial, the district court concluded that these documents established neither that the "replacement DD-214" was fraudulent nor that Swisher's testimony was false. On Monday, January 24, after reviewing Swisher's military file, including the Dowling letter, over the weekend, the court told counsel outside the presence of the jury that it found the file "very difficult to decipher," and stated that "the truth of the matter" was "not at all clear." The court told counsel that the documents in the file were "neither self-authenticating nor self-explanatory" and did "not conclusively decide the issue." The court concluded that it was "not at all convinced" that it

had enough evidence to "resolve the question of whether or not the document that Mr. Swisher pulled out of his pocket is false or not."

The court remained uncertain at trial about the truthfulness of Swisher's testimony and the authenticity of the "replacement DD-214," despite the fact that Swisher's military file was a government record that the court itself had subpoenaed, and despite the fact that the file contained the Dowling letter. The Dowling letter, written by an officer in the Headquarters of the U.S. Marine Corps, stated in plain language that the "replacement DD-214" was a forgery and that Swisher had not earned any personal military commendations. Another factfinder may have found this evidence sufficient to establish that Swisher was a forger and a liar. But we accept the district court's judgment that the evidence then before it was inconclusive.

[13] The district court stated during trial that "the only way" to resolve the uncertainty surrounding the "silent file" would be to hear from "a records custodian from the National Personnel Records Center or someone who is more familiar with military records and decorations than any of us." The prosecutor agreed with the court's assessment and added:

> What [the defense] would really have to prove, if this were to be resolved, is that . . . the substitute DD-214 signed by Captain Woodring, in, I believe, October '57 — that . . . the signature of Captain Woodring was forged; and I would suggest that probably would resolve whether it's correct or not.
>
> How you would prove that something that was signed in 1957 — I doubt very much Mr. Woodring is still with us, but I don't know.

Precisely the additional evidence the court said was lacking was supplied by the defense in its motion for a new trial in the

form of the affidavit from Chief Warrant Officer Miller. Miller is the U.S. Marine Corps "Liaison Officer to the National Personnel Records Center." His job is to "evaluate the authenticity of information, records and documents affecting individual Defense Department transfer documents including DD Forms 214." Miller concluded, after a thorough investigation, that the replacement DD-214 was a forgery and that Swisher had not earned a Purple Heart or any other personal commendation.

**[14]** Similarly, precisely the additional evidence the prosecutor said was lacking was supplied in the form of the affidavit from the now-retired Colonel Woodring. As it turned out, possibly to the prosecutor's surprise, Colonel Woodring is indeed "still with us." Colonel Woodring stated unequivocally in his affidavit that his signatures on both the purported 1957 letter to Swisher and the replacement DD-214 were forgeries.

**[15]** In sum, the court stated at trial that the evidence before it was insufficient to allow it to determine the truth or falsity of Swisher's evidence. Defense counsel then presented to the court, in support of the motion for a new trial, precisely the additional evidence the court and the prosecutor said was needed to resolve the uncertainty. We conclude that, in this circumstance, this new evidence was not cumulative.

The dissent concludes that the Miller and Woodring affidavits are cumulative because "the Tolbert letter and the Dowling letter . . . established . . . that the replacement DD-214 was a forgery and that Swisher had lied about receiving military awards." Diss. at 6183. As we noted above, the dissent would be on firmer ground in so concluding if the district court had agreed with this statement. However, the district court was very clear in saying precisely the opposite of what the dissent now says. As we have just explained, the district court concluded that Swisher's entire personnel file, including the Tolbert and Dowling letters, was insufficient to "establish that the replacement DD-214 was a forgery and that Swisher

had lied about receiving military awards." Given the district court's view of the evidence then available, it is impossible to conclude that the Miller and Woodring affidavits are cumulative.

## 2.   Merely Impeaching

**[16]** The fourth part of the *Harrington* test states that a defendant must show that the newly discovered evidence is not "merely impeaching." We have expressly rejected the proposition that "impeachment evidence . . . is *never* sufficient to warrant a new trial under Fed. R. Crim. P. 33." *Davis*, 960 F.2d at 825 (emphasis in original); *see also United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991) (as amended) (concluding that new evidence impeaching the government's central witness was powerful enough to require a new trial); *United States v. Taglia*, 922 F.2d 413, 415 (7th Cir. 1991) (explaining that the prohibition on using impeachment evidence to secure a new trial should not be "taken at face value"); *Balestreri v. United States*, 224 F.2d 915, 917 (9th Cir. 1955) ("To deny in every case a motion for a new trial on the ground of newly discovered evidence for the sole reason that the evidence was 'merely impeachment' might often lead to injustice.").

**[17]** We recognized in *Davis* that enforcing a per se prohibition on impeachment evidence as the basis for a new trial would be inconsistent with the spirit of Rule 33, which "permits the granting of a new trial motion 'if required in the interest of justice.' " *Davis*, 960 F.2d at 825. A per se prohibition would also be inconsistent with our longstanding refusal to draw a "categorical distinction between types of evidence." *Taglia*, 922 F.2d at 415; *see also Giglio v. United States*, 405 U.S. 150, 154-55 (1972) (refusing to distinguish between exculpatory and impeachment evidence in the *Brady* context); *Napue v. Illinois,* 360 U.S. 264, 269 (1959) (refusing to distinguish between exculpatory and impeachment evidence in cases involving prosecutorial misconduct). Accordingly, we

recognized in *Davis* that sometimes "newly-discovered impeachment evidence may be so powerful that, if it were to be believed by the trier of fact, it could render the witness' testimony totally incredible. In such a case, if the witness' testimony were uncorroborated and provided the only evidence of an essential element of the government's case, the impeachment evidence would be 'material' under [the *Harrington* test]." *Davis*, 960 F.2d at 825; *Taglia*, 922 F.2d at 415 (holding that a new trial would be warranted under Rule 33 if it were discovered after trial that the government's star witness was "utterly unworthy of being believed because he had lied consistently in a string of previous cases"); 3 Wright et al., *supra*, § 557, at 560, 563 (noting that impeachment evidence is usually "not sufficient to justify a new trial," but that this is not an "invariable rule," and "in flagrant cases it may suffice").

**[18]** In its order denying Hinkson's new trial motion, the district court wrote that "the proffered evidence [*i.e.*, the Miller and Woodring affidavits] is impeachment evidence and so is not a valid basis for a new trial." It is apparent from this statement that the district court mistakenly believed that impeachment evidence may never provide the basis for a new trial. Our cases do not so hold. The relevant question under *Harrington* is whether the newly discovered evidence makes it probable that a new trial would result in acquittal.

The dissent relies on *Davis* to conclude that the Miller and Woodring affidavits are impeaching and therefore cannot satisfy the fourth requirement of *Harrington*. It relies on the sentence from *Davis*, quoted above, stating that if the impeached witness's testimony was "uncorroborated and provided the only evidence of an essential element of the government's case," impeachment evidence would satisfy *Harrington*. *Davis*, 960 F.2d at 825; diss. at 6183. The dissent writes, "But that circumstance does not describe the evidence here." *Id.* The dissent is wrong.

An essential element of the government's case was that Hinkson solicited Swisher to murder Cook, Hines and Lodge. *See* 18 U.S.C. § 373. To qualify as a solicitation under § 373, the defendant must have had an "intent" that the object of the solicitation actually be carried out. *Id.* at § 373(a). That is, the solicitation must have been serious.

There was ample evidence presented at trial that Hinkson asked many people, not only Swisher, to murder Cook, Hines and Lodge. However, the question before us is not whether Hinkson solicited someone else to commit murder. The question is whether Hinkson solicited *Swisher* to commit murder within the meaning of § 373. On that precise question, Swisher was the only witness.

As we describe in detail in the next section, the government contended that Hinkson seriously solicited Swisher to commit murder. The first solicitation was to kill Albers, but that solicitation was not charged in the indictment. The second and third solicitations, which *were* charged in the indictment, were to murder Cook, Hines and Lodge. Swisher testified unambiguously that there were no corroborating witnesses who would have been able to confirm that any of these solicitations were serious. According to Swisher's explicit testimony, all three solicitations were "in private." Because the solicitations to murder Cook, Hines and Lodge were made "in private," there was by definition no corroborating witness to an essential element of the government's case.

**Volume 2 of 2**

### E. Probability of Acquittal on Retrial

The fifth *Harrington* requirement is that "the new evidence must indicate that a new trial probably would result in acquittal." The dissent summarizes and characterizes the evidence presented at trial in an effort to show that a new trial would probably not result in an acquittal. In our view, the dissent has provided an incomplete and misleading description of the evidence. The dissent complains that "in an effort to reconstruct the trial from the bottom up and in hindsight, the majority goes to great lengths to marshal the evidence, vigorously arguing the facts and the inferences from those facts." Diss. at 6169. But because of the record-intensive nature of the inquiry required under *Harrington*, and because of the incomplete and misleading description of the evidence provided by the dissent, we have little choice but to describe the evidence in detail. We apologize to the reader in advance for the length of the discussion.

Three solicitations to murder were charged in Counts 1 through 3 of the indictment. In these counts, the government charged that Hinkson had solicited James Harding "in or about January 2003" to murder Cook (Count 1), Hines (Count 2) and Lodge (Count 3). The jury acquitted Hinkson on all three of these counts.

Three more solicitations were charged in Counts 4 through 6. In these counts, the government charged that Hinkson had solicited James Harding "on or about March 17, 2003" to murder Cook (Count 4), Hines (Count 5) and Lodge (Count 6). The jury deadlocked on these three counts.

Three more solicitations were charged in Counts 7 through 9. In these counts, the government charged that Hinkson had solicited Swisher "between about December 2002 and February 2003" to murder Cook (Count 7), Hines (Count 8) and Lodge (Count 9). The jury returned a verdict of guilty on these counts.

Finally, two threats to commit murder were charged in Counts 10 and 11. In these counts, the government charged that Hinkson made statements to Anne Bates in which he threatened to murder the children of Cook (Count 10) and the children of Hines (Count 11). The jury acquitted Hinkson on these counts.

The issue at trial was not whether Hinkson asked various people to kill Cook, Hines and Lodge. The evidence was persuasive that he had done so. The issue was whether Hinkson had been serious. That is, the issue was whether he had an actual "intent" that Cook, Hines and Lodge be killed. 18 U.S.C. § 373(a). Only if Hinkson had been serious in soliciting the murder of Cook, Hines and Lodge had he committed a criminal offense.

The jury acquitted Hinkson outright on three of the nine counts charging solicitation in violation of § 373(a). On these three counts, the jury concluded that the government had not shown that Hinkson had been serious in soliciting murder on that occasion. The jury could not make up its mind on three more of the counts, unable to conclude unanimously that Hinkson had been serious in soliciting murder on that occasion. The jury was able to conclude unanimously only on three counts — Counts 7-9, the counts involving Swisher — that Hinkson had been serious in soliciting murder. In order to assess the likelihood of an acquittal on retrial on the three Swisher-related counts (Counts 7-9), it is useful to examine the evidence on which Hinkson was acquitted on the three Harding-related counts (Counts 1-3).

More than half of the trial testimony provided background evidence for all of the counts charged in the indictment. This background evidence showed that Hinkson owned and operated a lucrative business called WaterOz in Grangeville, a small town in Idaho. WaterOz bottled water into which had been dissolved, by a secret process invented by Hinkson, very small particles of minerals such as gold and platinum.

According to Hinkson, the water has marvelous medicinal properties. He advertised and sold the water over the Internet.

Hinkson did not pay federal income tax, on the asserted ground that he was not legally obligated to do so. (In a separate appeal, we affirm today Hinkson's criminal conviction on his tax and currency structuring offenses.) Hinkson was unstable and paranoid. Hinkson was continually worried that people, including government officials and his own employees, were trying to take WaterOz from him. After Cook and Hines participated in an early-morning raid of his home in November 2002, Hinkson repeatedly claimed that they had tried to murder him. Hinkson also repeatedly claimed that an attorney named Dennis Albers, who previously had represented a plaintiff in a successful suit against him, was trying to murder him.

Hinkson developed grudges easily and held them tenaciously. He had a special dislike for employees of the federal government. Sometimes his talk was somewhat comical. For example, he talked to James Harding about a "fed-a-pult" and a "fed-guard." According to Harding, a "fed-a-pult" was a device to catapult federal agents into a canyon or into an oncoming train. A "fed-guard" was something to put "on the front of your car like a cattle guard." Sometimes his talk was not comical at all. For example, the evidence at trial showed that Hinkson asked multiple people, on multiple occasions, to kill Cook, Hines and Lodge, and that Hinkson repeatedly said he wanted to torture and kill people, including the children of Cook and Hines.

### 1.   Evidence Supporting Counts 1-3

Counts 1 through 3 charged that in January 2003 Hinkson solicited James Harding to kill Cook, Hines and Lodge. As noted above, the jury acquitted Hinkson on these counts.

The evidence supporting Counts 1 through 3 was as follows. In November or December 2002, Harding and Anne

Bates met Hinkson at a "health forum" in Southern California. At that time, Harding was a restaurant manager in Southern California. Previously Harding had been a bodyguard and had worked "in the entertainment field." He had most recently "hosted" radio shows on "the paranormal"; before that his radio work was had been "comedy shows, morning shows, afternoon drive, entertainment." His last radio work was three years before he testified.

After the "health forum," Hinkson, Harding, Bates and several others went out to eat. During the meal, Hinkson offered Bates a job at WaterOz. Harding and Bates drove to Grangeville at the beginning of January 2003 and stayed at Hinkson's house.

On the second night of Harding and Bates's stay, Harding was sitting at the kitchen table. Bates was nearby. Harding testified that Hinkson handed him "a large sum of money." Harding responded with a crude joke: "Who do I have to blow?" According to Harding, Hinkson responded "something like, 'It's not who you have to blow but who you have to kill.' " Harding testified, "I could make this much money killing [Cook, Hines and Lodge]. He had also a wad with him of some sort; and that was supposed to be another $10,000. There was a $10,000 flat fee, and this was a wad of $10,000." Harding testified that Hinkson then "pulled back . . . and it became a joke." But, Harding testified, "I assumed that I was being tested." He testified further, "And when the $10,000 came up, I thought this was his test."

Bates, who was also in the kitchen, testified about the episode. "We were at the table in the kitchen . . . . He was saying something along the lines that he would like some of these people dead, and he had a lot of money that he produced from somewhere. And I don't know if — maybe in a joking manner, he offered it to J.C. [*i.e.*, Harding] and said, you know, 'Whoever does this, this is theirs,' something along those lines from what I can remember." The prosecutor asked: "Did

he say it was a joke?" She answered, "He did not say it was a joke, no."

Bates remained in Hinkson's house in Grangeville, but Harding went back to Southern California to bring Bates's things back in a U-Haul. On Harding's return he again stayed in Hinkson's house, "probably" during the second week of January. Harding testified as follows:

> Q.   Did you have any further discussions with Mr. Hinkson where he talked about these three feds, federal officials?
>
> A.   Every time I talked to Dave. That was on his mind every time when we talked on every occasion.
>
> Q.   Did that happen on the second occasion?
>
> A.   Absolutely, yes. . . .
>
> Q.   What did he say?
>
> A.   That they need to die; they are demons; they need to be tortured. It was sick stuff that I don't like coming out of my mouth. . . . I hate them; they are demons; they need to die; they need to be killed; I have got people working on that. You never know if he is kidding or serious. I want their throats cut; I want them tortured; I want them taken out and shot in the knee caps and told who is having it done and why it's being done.
>
> . . .
>
> Q.   Did he say how he wanted Agent Hines killed or harmed?
>
> . . .

A.   No. The second visit . . . it wasn't specific. It was just malicious rhetoric, like I'm saying. He would be killed, executed. Dave becomes a madman when he talks about it. He will, literally, get very angry. It's anything you can think of that is wild. It grew and grew each time.

During this second visit, Hinkson asked Harding to get ammunition for guns that Hinkson kept in the house. Harding testified that while Hinkson did not seem to know much about guns, he was very interested in what Harding knew about them: "[W]e talked about my knowledge of guns and that I grew up around guns and shotguns. He wanted to know how extensive my background was, the basics of how I got into it and why I was into it." Harding testified that he had worked as a bodyguard, and that Hinkson knew him through a friend who was also a bodyguard:

Q.   How do you know he knew you through another bodyguard?

A.   They were good friends. They were close friends.

Q.   Who is that?

A.   Mark Glover. . . . Him and David — I don't know how — are very close friends. And I know Mark through doing security work, bodyguarding.

. . .

Q.   Have you worked as a bodyguard?

A.   Yes.

Q.   Have you worked with Mr. Glover?

A.  Yes.

Harding became very friendly with Hinkson and frequently stayed at his house in Grangeville on the weekends. During those visits, Hinkson repeatedly discussed killing Cook, Hines and Lodge.

Q.  On the occasions that you go back up to Grangeville, would you see Mr. Hinkson?

A.  Yes.

Q.  Would you talk to him on the same subject matters of the three federal officers?

A.  Extensively.

Q.  Did he mention these things about killing federal officers more than once?

A.  Every time we spoke, yes.

Q.  How many times?

A.  Fifty. . . .

Q.  Did there come a time when he also offered you money?

A.  Yes.

Q.  In relationship to when you first came to Grangeville, that first trip in early January, when would be the second time he offered you money?

A.  A couple of weeks, maybe.

The second time Hinkson offered Harding money, the two men were driving to the bank. Harding testified that Hinkson had $10,000 with him.

> Q.   What did he say . . . ?

> A.   Just leading. You could use the cash. Do you need cash? Do you need money. You could use this extra money. Think about it. I never knew if he was serious or kidding. He always talked about it and said it; and it was always leading, like I was supposed to bite.

Harding eventually became convinced that Hinkson had been serious in soliciting him to kill Cook, Hines and Lodge. When Hinkson solicited him again in March of 2003, Harding contacted the F.B.I. He spoke to Nancy Cook, telling her, "Somebody is going to make an attempt on your life, I believe, if I don't make this phone call." The F.B.I. arranged for Harding to go back to Hinkson's house with a recording device concealed on his body. Possibly because Hinkson suspected the existence of the device, Hinkson said nothing incriminating on that occasion.

### 2.   Evidence Supporting Counts 7 through 9

Counts 7 through 9 charged that between December 2002 and February 2003, Hinkson solicited Swisher to kill Cook, Hines and Lodge. As noted above, the jury convicted Hinkson on these counts.

We have already described much of the evidence supporting Counts 7 through 9. We recount it here in more detail to facilitate a meaningful comparison to the evidence supporting Counts 1 through 3. Swisher took the stand wearing a Purple Heart pin on his lapel. On direct, he was folksy and garrulous:

> Q.   Mr. Swisher, how old of a man are you?

A.  I turned 68 yesterday.

Q.  You live in Idaho?

A.  Yes, I do.

Q.  For how long?

A.  My gosh. Over thirty years.

. . .

Q.  How did you have an interest in mining?

A.  Well, I have an old friend, who is now dead —
bless his soul — and he was one of the — he was the
epitome of an Idaho range rider till the day he died.
He carried an old, single-action Colt .45 and rode the
range in the back country.

Q.  My question is: How did you manage to switch
careers [to mining]?

A.  I'm getting to that, counselor.

Swisher testified that he had expertise in "assaying," and
testified at some length about his work for WaterOz testing
the concentration of minerals dissolved in the water. Then the
prosecutor asked him about his military background, and
Hinkson's interest in that background:

Q.  Have you ever served in the Armed Forces, Mr.
Swisher?

A.  Yes.

Q.  Did Mr. Hinkson ever ask you about your ser-
vice in the Armed Forces?

A.  Yes.

Q.  What branch did you serve in?

A.  United States Marine Corps.

Q.  Did you ever discuss that with Mr. Hinkson?

A.  Yes.

Q.  And what was the nature of your discussion with him?

A.  As I recall, Mr. Hinkson stated he had been in the Navy. I indicated I had been in the Marine Corps. He asked if I had served in any combat situations. I . . . told him, "Yes."

Q.  What else did he ask you about combat situations?

A.  He asked if I had ever killed anyone.

Q.  What did you say?

A.  I told him, "Yes." He asked, "How many?" And I told him, "Too many."

Q.  Was that one conversation or several?

A.  It may have happened over a period of time.

Q.  What period of time?

A.  Oh, probably off and on throughout the year 2001.

Swisher testified that Hinkson knew that he was expert with firearms:

Q.   Did you ever claim to Mr. Hinkson that you had proficiency with firearms?

A.   I believe he knew that I was an expert rifleman, pistolman.

Q.   How did he know that?

. . .

A.   I probably told him, and he observed my shooting.

Q.   What was the occasion that you went shooting with him?

A.   I believe it was probably in December, sometime in December of 2002, that he had a gentleman from . . . Ukraine, visiting. . . . He said we were going to meet out at an employee's who lived in the country, Mr. Rich Bellon. . . . [W]e shot during the course of the day.

Q.   Who did?

A.   Myself, Mr. Hinkson, and the Russian gentleman.

. . .

Q.   What did you bring?

A.   I brought a .22 Henry lever-action rifle and .32 semi-automatic Browning pistol, and a .45 auto.

Q.   How was your shooting?

A.   I always hit what I aim at.

Q. How was Mr. Hinkson's shooting?

A. Not terribly good.

Q. What were you shooting at?

A. Well, we shot some trap with a shotgun. I only shot maybe a half dozen times because I recently had a pacemaker installed; and a shotgun, a twelve-gauge particularly, kind of jars you around a little. I decided I would quit in due time, but I hit my targets. As I recall, I don't believe David hit any of his.

Swisher described their "trap shooting" as follows:

The person who wasn't shooting would throw the clay pigeons for the others. You have a spring-loaded hand unit that will kick them out, I expect, thirty, forty yards without any problem at all, airborne. . . . And the challenge is to hit the airborne target when it's across from you.

Swisher testified that Hinkson was very angry at Dennis Albers, whom Swisher also disliked. Swisher testified that sometime shortly after April 2002 Hinkson told him "in private" that he wanted Albers and his family members tortured and killed:

Q. What was it that Mr. Hinkson said?

A. Well, he started off by talking about how he would like to have Mr. Albers and his family, particularly his wife, Margaret, tortured and killed. And he went into quite a description of the torture.

Q. And what was that?

A. He would — he said he would like to see them stripped, bound, and gagged, and then burned with

cigarettes or cigars. And then while Albers was down on his knees observing this occurring to his wife and any other family members that might be present, he wanted to have a plastic bag put over her head so that she would suffocate to death in front of him, along with the other family members. Then he wanted that procedure repeated on Mr. Albers, himself.

Q.   Did he want you to do something in that regard?

A.   When he finished describing what he wanted done, then he offered me $10,000 a head to do it.

Q.   What was his demeanor like when he was telling you these things?

A.   He was cool and calm at that time.

Q.   What was your response to Mr. Hinkson?

A.   I told him he was out of his mind and he needed to knock that kind of BS off, and I didn't even think about it.

Q.   How did he respond to that?

A.   He just smiled and then didn't reply and changed the subject.

Swisher testified that he had a further conversation "in Hinkson's trailer" in July or August of 2002:

Q.   What did Mr. Hinkson say about how he felt about Nancy Cook and Steve Hines?

A.   He wanted them treated in the same fashion as he had initially described for Mr. Albers and his

family . . . . [H]e asked if I remembered the offer he made regarding Mr. Albers and his family. And I said that, of course, I did. And he said he wanted that done, basically, with Ms. Cook and her family and Mr. Hines and his family. And I told him, again, that he was out of his mind. And I, also, went into a little bit of a dissertation because David was a friend at that time. And he said, "Well, you know, I know you're used to it. I mean, you have killed people." I said, "Yes, I have killed people in defense of my life and others; but what you are talking about is murder, and there is a significant difference here. And you need to get it out of your head because, if you continue talking that way, it will get you in trouble. And if you continue talking this way and I think you are serious about this, I will have to report it to the authorities."

Q.  How did he respond to that?

A.  Well, he got his smile again; and then he changed the subject[.]

Swisher testified that after Cook and Hines arrested Hinkson in a raid on his house in November 2002, his hostility toward them intensified. Swisher testified, further, that Hinkson had a third conversation in which Judge Lodge was added to the list of intended victims:

A.  [I]n January of '03, he approached me again[,] went through the names of the people that had offended him, and added a federal judge by the name of Lodge to that list. And I, essentially, dropped the hammer at that point on David.

Q.  Let me first ask what he asked you to do regarding those people?

A.   He wanted them all treated the way that the initial offer regarding Albers and his family had been handled.

Q.   Were you to receive anything in return for doing that?

A.   At least $10,000 a head. And I made a mental note that, with all of the people he named at that time, we were well over $100,000.

. . .

Q.   Did the $10,000 offer include Nancy Cook and Steve Hines?

A.   Oh, yes.

Q.   Did it include Mr. Albers?

A.   Yes.

Q.   Did it include the children of those people?

A.   Yes.

Q.   What did he want done with the children of those people?

A.   Treated in the same fashion.

Q.   How?

A.   Tortured and killed.

Q.   Now, you mentioned, this time, you reacted in a different fashion?

A. Yes, I did. I'm afraid I became a bit hostile, myself, at that point in time.

Q. What did you say?

. . .

A. I told him, regarding these matters of trying to kill people or having me murder them for him and so on, that I never wanted to hear that again and to fuck off. And he left.

Q. What was his demeanor like when he was asking you to do this?

A. He was almost in a pleading fashion that last time. He was telling me how harassed he had been and how they had hurt him and they were out to not just get him but to kill him, too, and he just had to have this done; and as his best friend, as he put it at that time, he felt I should do it.

Swisher testified that sometime in the spring or summer of 2003, he finally contacted a law enforcement official. However, he was unsure about the date on which he did so, and he was unforthcoming about the details of what he told law enforcement officials:

Q. . . . When did you contact anyone in legal authority regarding Mr. Hinkson?

A. Oh, I think it was probably just before he was re-arrested in '03. I'm not quite sure of the date there.

Q. Are you talking about spring or summer '03 or what?

A.   No. It would have probably been getting close to summer there. Spring, summer, somewhere through there. Sometime after April, I'm thinking.

Q.   All right.

A.   I might be wrong.

Q.   And who did you contact?

A.   I contacted the Idaho County Assistant Prosecutor from Grangeville.

Q.   Now, is he a State Prosecutor, as opposed to a Federal Prosecutor?

A.   Yes. That's correct.

Q.   And did you express some concern to him?

A.   I did.

Q.   Was it regarding Mr. Hinkson?

A.   Yes.

Q.   Thereafter, were you contacted by the FBI?

A.   Yes.

Q.   Who contacted you?

A.   Mr. Will Long.

Q.   That's the person here at the table?

A.   Correct, sitting right there.

THE COURT: For the record, the witness has identi-
fied Special Agent Long.

[THE PROSECUTOR]: Thank you, Your Honor. I
have no further questions on direct, Your Honor.

The government's direct examination of Swisher filled
forty-three pages of transcript. Cross examination, not includ-
ing Swisher's testimony about the Purple Heart and "replace-
ment DD-214," filled eighty-three pages. During this cross
examination, Swisher made clear that on the three occasions
when Hinkson solicited him to kill Albers, Cook, Hines and
Lodge, there were no witnesses: "When he made the three
direct solicitations to me, they were made in private."

Much of the cross examination was devoted to showing the
extreme hostility between Swisher and Hinkson. This extreme
hostility had arisen after Hinkson's supposed solicitations of
Swisher to commit murder, and it had arisen for reasons that
were unrelated to the solicitations. Richard Bellon was one of
Hinkson's key employees at WaterOz; indeed, the trap shoot-
ing had taken place at Bellon's house. Sometime in late 2003,
Bellon sued Hinkson for ownership, or partial ownership, of
WaterOz. In response, Hinkson brought Swisher into the suit,
apparently as a third-party defendant. Swisher then counter-
claimed against Hinkson for more than $500,000.

Relations between Swisher and Hinkson became so
strained that Swisher accused Hinkson of hiring someone to
kill him. Swisher testified that he was "at a remote area in
Idaho County with a Vietnam combat veteran friend."
Swisher was sitting in an outhouse when, according to his tes-
timony, someone hired by Hinkson shot at him and missed.
However, Swisher admitted that he never saw the person who
supposedly did the shooting, and that no shell casings or foot-
prints were ever found.

Only one witness corroborated Swisher's testimony that
Hinkson had been interested in, and impressed by, Swisher's

military background. That witness was Richard Bellon. Bellon testified that Hinkson "wanted to hire Joe Swisher as a bodyguard." "[H]e felt like he needed to hire [Swisher] because he was trained":

> Q.  Did [Hinkson] explain to you how Mr. Swisher was trained?
>
> A.  Yes. . . . [I]t was that Mr. Swisher had an extensive military background, that he had been in combat, and that he had killed people during the war. Mr. Hinkson would tell me about that and the details of him, his past.

In his own testimony, Swisher never mentioned that Hinkson had wanted to hire him as a bodyguard. Nor did Swisher ever mention that Hinkson had been interested in his military background because of a desire to hire a bodyguard.

Hinkson took the stand in his own defense. Swisher had already testified that on three occasions Hinkson had solicited him "in private" to commit murder. Hinkson specifically denied having made such solicitations:

> Q.  Mr. Hinkson, Mr. Swisher indicated that he had been solicited by you on a number of occasions[.] . . . Do you recall that he said that in his testimony?
>
> A.  . . . Yeah.
>
> Q.  Mr. Hinkson, did you ever have a communication with Mr. Swisher where you asked him to murder anyone?
>
> A.  No, sir.

Hinkson had a somewhat different recollection of the excursion to Bellon's house. According to Swisher, they had

engaged in trap shooting "during the course of the day." Swisher testified, "I hit my targets." Hinkson testified:

> Q.  Do you remember the evening that Mr. Swisher went to Mr. Bellon's house with you for dinner?
>
> A.  Yes, I do.
>
> Q.  And I believe there was testimony that that occurred in approximately September of '02?
>
> A.  Yes, just before his open heart surgery.
>
> . . .
>
> Q.  And there was someone who came to dinner that night? Who was that?
>
> A.  Roman Polankio from the Ukraine.
>
> . . .
>
> Q.  Who fired the gun that evening?
>
> A.  I'm not really interested in guns, and I shot it twice. Mostly, Joe [Swisher] shot from his chair because he had a hard time standing. He was pretty sick.

Bellon, at whose home the trap shooting took place, was called by the government to testify. The government did not ask Bellon whether it was true that Swisher was then "pretty sick" with heart disease; that Swisher shot "mostly . . . from his chair"; or that Swisher successfully hit all of his targets. Those targets, according to Swisher's testimony, had been rapidly moving airborne clay pigeons thirty to forty yards away.

### 3.   Comparison of the Evidence in Counts 1 through 3 and Counts 7 through 9

The background evidence against Hinkson was the same for both Counts 1 through 3 (the Harding-related counts on which he was acquitted) and Counts 7 through 9 (the Swisher-related counts on which he was convicted). It was relevant to all of these counts that Hinkson had a paranoid unstable personality; that he disliked government interference with his affairs; that he particularly disliked Cook, Hines and Lodge; and that he had asked multiple people on multiple occasions, not limited to Holding and Swisher, to kill Cook, Hines and Lodge on his behalf.

The evidence specific to Counts 1 through 3 and Counts 7 through 9 is similar in a number of respects. First, there was evidence that Hinkson believed that both Harding and Swisher were skilled in the use of firearms. Second, there was evidence that Hinkson knew that Harding had been a bodyguard, and that he was interested in using Swisher as a bodyguard. Indeed, Bellon testified that Hinkson's interest in Swisher's military background and skill in firearms stemmed from his interest in using Swisher as a bodyguard. Third, the charged solicitations took place at about the same time. Counts 1 through 3 involved conduct that supposedly took place in January 2003. Counts 7 through 9 involved conduct that supposedly took place between December 2002 and February 2003.

The evidence specific to these counts differed in some respects. However, three of those differences made it more likely that the jury would have convicted on the Harding-related counts rather than on the Swisher-related counts.

First, there was a corroborating witness to one of the charged solicitations of Harding. Bates was a witness to the solicitation in Hinkson's kitchen at the beginning of January. She testified that she saw the "wad" of money on the kitchen

table and that she heard Hinkson tell Harding that the money was his if he killed Cook, Hines and Lodge. Bates testified that Hinkson had not said that we was joking when he said this. By contrast, Swisher testified that there were no witnesses to any of Hinkson's three solicitations. He specifically testified that all three solicitations took place "in private."

Second, Harding and Hinkson were good friends at the time of the solicitations. They became unfriendly only as a result of Harding's reporting to the F.B.I. that Hinkson had solicited him to commit murder. Swisher and Hinkson also had been good friends at the time of the solicitations. But, by contrast to Harding, Swisher had become a bitter enemy, for reasons unrelated to the solicitations, by the time of trial. Thus, unlike Harding, Swisher had ample reason, unrelated to the solicitations, to wish Hinkson ill when he testified at trial.

Third, Harding testified that Hinkson first solicited him in January 2003 to murder Cook, Hines and Lodge. He testified that Hinkson solicited him again in March 2003. Immediately after the March solicitation, Harding contacted the F.B.I. In an effort to help the F.B.I., Harding went so far as to wear a secret recording device in an attempt to obtain incriminating evidence against Hinkson. By contrast, Swisher testified that Hinkson solicited him shortly after April 2002 to murder Albers. Swisher testified further that Hinkson solicited him in July or August 2002 to murder Cook and Hines. Finally, Swisher testified that Hinkson solicited him in November 2002 to murder Cook, Hines and Lodge. Swisher testified that he did not go to a local Idaho prosecutor to report Hinkson's solicitations until sometime after April 2003.

Harding was so concerned about Hinkson that he went to the F.B.I. within two months of the time Hinkson first solicited him, and immediately after the second time. When Harding contacted the F.B.I., he and Hinkson were still on good terms. Harding testified that he spoke directly to Nancy Cook, one of Hinkson's would-be victims, and told her that he

thought she was in danger. Harding then wore a wire at the request of the F.B.I. in an attempt to obtain evidence against someone he clearly thought was dangerous. By contrast, Swisher waited at least a year after Hinkson solicited him to murder Albers, at least nine or ten months after Hinkson solicited him to murder Cook and Hines, and at least three or four months after Hinkson solicited him to murder Cook, Hines and Lodge. Unlike Harding, Swisher called a local Idaho prosecutor rather than the F.B.I., even though federal officers had been threatened, and, unlike Harding, Swisher gave no specifics about what he told law enforcement officials. When Swisher finally contacted the local prosecutor, he and Hinkson were no longer on good terms. There is nothing in the record to indicate that Swisher ever offered to wear a wire or otherwise to help gather incriminating evidence against Hinkson.

In three respects the evidence against Hinkson was stronger in the Swisher-related counts than in the Harding-related counts.

First, Swisher testified that Hinkson believed him to be particularly well qualified to be a killer. Swisher testified that he told Hinkson about his combat experience in Korea, and that he had killed "too many" people. We now know that story to be false. However, there is evidence from both Swisher and Bellon that Hinkson believed the story. Swisher's (falsely claimed) combat experience could well have made a greater impression on Hinkson than Harding's experience with firearms and his work as a bodyguard. There was a great deal of evidence at trial — most of it from Swisher himself — about Swisher's ill-health. But the jury could have concluded that despite Swisher's ill-health, Hinkson could have seen him as a well qualified killer.

Swisher further testified that while trap shooting he had demonstrated to Hinkson that he was an excellent shot. The jury might have had some reason to doubt Swisher's story

about hitting all of his targets, given that Hinkson described Swisher as a very sick man who sat in a chair while shooting. But the jury could well have disbelieved Hinkson, and could have believed that Swisher had indeed demonstrated to Hinkson on that occasion that he was an excellent shot. The jury could have concluded that an actual demonstration of shooting prowess by Swisher was more impressive to Hinkson than Harding's mere talk about his knowledge of guns.

Second, Swisher testified that during the first solicitation Hinkson's "demeanor" had been "calm and cool," and that during the third solicitation Hinkson's "demeanor" was "almost in a pleading fashion." By contrast, Harding testified that he had difficulty telling whether Hinkson was serious in soliciting the murders. Only after a second solicitation in March did Harding decide that Hinkson had been serious.

Third, Swisher presented himself as a United States Marine who had been wounded in the service of his country. His status as a decorated war hero may have been, for some or all of the jurors, an additional reason to believe his testimony. The jury may have found Swisher particularly credible and sympathetic when, after an accusation by Hinkson's counsel that Swisher was lying about his military record, Swisher dramatically produced his "replacement DD-214" from his pocket. The jury might also, despite the district court's instruction, have penalized the defense for what appeared to be an unfounded attack on a decorated war hero.

However, our task is not to replay the first trial except as it might help us predict what would happen if Hinkson is retried on Counts 7 through 9. The question before us is what would happen at a new trial. Specifically, the question is whether the fifth *Harrington* requirement is satisfied: Does the new evidence "indicate that a new trial would probably result in acquittal"?

**[19]** In the original trial, Swisher was the only witness to provide direct evidence that Hinkson solicited him to commit

the killings. On retrial, the government would have no choice but to rely on Swisher to supply the evidence of Hinkson's solicitations. To say that Swisher's credibility would fare poorly at a new trial is an understatement. At Hinkson's original trial, the jurors almost certainly had the impression that Swisher was a decorated combat veteran. The prosecutor described Swisher in his opening statement as a "Combat Veteran from Korea during the Korean Conflict" who "was not averse to . . . violent, dangerous activity," and stated in his closing argument that Hinkson "understood" that Swisher "had served in combat and killed people." In response to defense counsel's questions, Swisher produced his "replacement DD-214" on the witness stand and testified that he had seen combat in Korea and earned a Purple Heart. Defense counsel asked the district court to instruct the jury to disregard that testimony stricken because he feared that the jury might penalize the defense for wrongly assailing a war hero. Although the court granted defense counsel's request, the court's instruction to the jury referred to Swisher's lapel pin as a "Purple Heart Medal" and a "military commendation."

[20] Defense counsel's efforts to impeach Swisher at the original trial focused on the fact that Swisher and Hinkson, who were once friends, were now bitter enemies who had sued and counter-sued each other. On retrial, impeachment of Swisher would not be so limited. The parties now know conclusively, based on the Miller and Woodring affidavits, that Swisher forged his "replacement DD-214" and his purported "supporting letter" from Colonel Woodring, and that he used these forged documents in an effort to obtain veterans' benefits. The parties also now know conclusively that Swisher never served in combat or earned any personal military commendations, and that he was not injured in battle overseas but in a private automobile accident near Port Townsend, Washington. And they now know conclusively that Swisher lied under oath about participating in secret combat missions in North Korea, about being wounded in action, and about receiving a Purple Heart.

At a new trial, the government could put Swisher on the stand to testify, as he did at the original trial, that he told Hinkson that he was a decorated Korean War veteran who had killed "too many" people. The government could then argue that Hinkson, believing these things, seriously solicited Swisher to kill three government officials. But this time, on retrial, defense counsel and the government would know the truth.

Defense counsel would impeach Swisher by asking if it was true that he was not in fact a Korean War veteran; that he had in fact not won a Purple Heart or other awards; that he had not in fact been injured in combat in Korea but rather in a private automobile accident; and that in fact he had lied to the Idaho Division of Veterans Services about his injuries and non-existent medals in an attempt to get military benefits to which he was not entitled. That would already be bad enough, but it would get worse. Defense counsel would also ask Swisher whether, the last time he appeared in court to testify under oath against Hinkson, he wore a Purple Heart lapel pin to which he was not entitled, presented a forged "replacement DD-214," and otherwise lied about his military record. This time, defense counsel would not be left defenseless if Swisher were to choose to lie in response to these questions because this time the government would also know the truth. If Swisher were to lie in response to any of the questions, the government would be obligated to correct the record. *See Napue*, 360 U.S. at 269; *Hayes*, 399 F.3d at 978.

**[21]** In short, a new trial would be a disaster for the government. A new jury would not only learn, as the first jury did, that Swisher and Hinkson, once friends, had become bitter enemies by the time Swisher testified. It would also learn, as the first jury did not, that Swisher has no compunction about lying under oath to serve his ends, and that he had lied under oath and produced forged documents at Hinkson's first trial. We therefore conclude, under the fifth part of the *Harrington* test, that a new trial would probably result in acquittal.

## F.   Summary

Because Hinkson's motion met all five requirements of the *Harrington* test, we hold that he is entitled to a new trial on the Swisher-related counts of soliciting murder.

## IV.   Conclusion

**[22]** We reverse the district court's denial of Hinkson's motion for a new trial. We do not reach Hinkson's other arguments. We remand to the district court to allow it to vacate Hinkson's conviction and sentence on Counts 7-9. Hinkson's conviction and ten-year sentence on the tax and currency structuring charges are not affected by our decision.

REVERSED AND REMANDED.

---

McKEOWN, Circuit Judge, dissenting:

There is no honor in lying about one's military record. Indeed, Elven Joe Swisher joins a long line of luminaries accused of puffing and distorting their military service.[1] But a witness discredited on a collateral issue—his military service—is not grounds to reverse a murder-for-hire conviction that was corroborated by independent evidence, particularly when defense counsel had full opportunity to cross-examine the witness on that subject. The question in this case is whether David Hinkson solicited Swisher to murder a federal judge and other public officers, not whether Swisher lied about his military service. The district court determined that information about Swisher's military service was not "new"

---

[1]*See* HENRY MARK HOLZER AND ERIKA HOLZER, FAKE WARRIORS: IDENTIFYING, EXPOSING AND PUNISHING THOSE WHO FALSIFY THEIR MILITARY SERVICE 15-21 (Xlibris 2003) (citing examples of a member of Congress, a prominent businessman and others who falsified military records).

evidence, the prosecutor had no advance knowledge of this information, the defense was not diligent in pursuing this line of attack, and the defense was afforded ample opportunity to impeach Swisher.

In granting a new trial, the majority has assumed the role of a super trial court rather than a reviewing court. The bottom line is that nowhere does the majority give any deference to the district court's detailed findings. Instead, in an effort to reconstruct the trial from the bottom up and in hindsight, the majority goes to great lengths to marshal the evidence, vigorously arguing the facts and the inferences from those facts, and forgetting that "[u]nder the abuse of discretion standard, we cannot simply substitute our judgment for that of the district court[.]" *United States v. BNS Inc.*, 858 F.2d 456, 464 (9th Cir. 1988). I respectfully dissent because the district court did not abuse its discretion in declining to order a new trial.

Reading the majority's opinion leaves one with the impression that Swisher's lies were a focal point of Hinkson's trial, and that evidence of his misdeeds would play a pivotal role in a new trial. Nothing could be further from the truth. Placing the alleged "new" evidence in context underscores why impeachment evidence on such an attenuated and collateral issue does not merit a new trial and why the rules are geared to avoid a mini-trial on collateral issues. *See United States v. Waggoner*, 339 F.3d 915, 919 (9th Cir. 2003) (rejecting evidence cited in support of new trial as "cumulative, impeachment-related, or both.").

### THE EVIDENCE AT TRIAL

After a two-week trial, a jury convicted Hinkson on three counts charging that Hinkson sought to persuade Swisher to murder United States District Judge Edward Lodge, Assistant United States Attorney Nancy Cook, and IRS Special Agent Steven Hines. More than fifteen witnesses testified at Hink-

son's trial, including Hinkson himself. At the conclusion of
the trial, the jury was left with no doubt that Hinkson was
enraged at the government for prosecuting him on tax and
currency structuring charges, and that he believed that the
government was colluding with others to destroy his business,
WaterOz, a "miracle water" company. Proud of his compa-
ny's success and deeply hostile towards anyone who chal-
lenged him, Hinkson was convinced that there was a "fairly
long, lengthy list of people that were in the conspiracy to get
him and take the company away from him."

The evidence at trial unequivocally demonstrated that
Hinkson hated Lodge, Cook, and Hines, and his feelings for
them were a matter of public knowledge. After the govern-
ment began its tax investigation, Hinkson filed a civil rights
suit against Cook, Hines, the IRS, and others, seeking $50
million in damages, the return of papers, and an injunction
halting the investigation. When Hinkson was a guest on a
radio show called the "Agitator Hour," he accused Cook of
forging the grand jury foreperson's name on the indictment
against him and the judge's name on a warrant authorizing the
search of WaterOz. He admitted at trial that he drafted an arti-
cle entitled "David Hinkson's Day of Terror, at the Hands of
Satan's Foot Soldiers" in which he claimed that Cook and
Hines "orchestrated" a dramatic raid on his house "for the
sole purpose of murdering me and ending the lawsuit that was
filed against them by me in the amount of $50 million dol-
lars." The evidence made crystal-clear that Hinkson, always
"ranting and raving," was out to get those who, in his mind,
were out to get him.

Hinkson knew Swisher well because Swisher, through an
independent testing company, had performed chemical analy-
sis of WaterOz products on an ongoing basis. Swisher testi-
fied that at one point in their relationship, Hinkson called him
his best friend, and promised him twenty acres of land so that
Swisher and his wife could live close to him. According to
Swisher, after telling Hinkson that he had been in the Marine

Corps, Hinkson asked him whether he had served in any combat missions. Swisher responded that he had. Hinkson allegedly then asked Swisher whether he had "ever killed anyone." Swisher answered that yes, he had. When Hinkson followed up with the question "how many?" Swisher responded, "Too many." Swisher also stated that he had discussed weapons and guns with Hinkson, and that Hinkson knew that he was an "expert rifleman [and] pistolman."

Critically, witness Richard Bellon corroborated in full Hinkson's belief in Swisher's military achievements. Bellon was a legal researcher who worked for Hinkson in connection with the government's tax investigation. Bellon testified that Hinkson informed him that Swisher had "an extensive military background," had "been in combat," and had "killed people during the war." Hinkson also told him that Swisher was "licensed to carry a gun," and that Hinkson was interested in hiring Swisher as a bodyguard "because he was trained."

Hinkson also had first-hand knowledge of Swisher's familiarity with guns and his shooting prowess. In December 2002, Hinkson invited Swisher to go on a trap-shooting trip with a visitor from the Ukraine. In testimony that was not refuted at trial, Swisher stated that he brought his own cache of guns with him on the trip: a .22 Henry lever-action rifle, a .32 semi-automatic Browning pistol, and a .45 automatic. Swisher's shooting performance was very impressive: he apparently hit all six of the targets, while Hinkson hit none.

All of this evidence strongly supports the conclusion that Swisher's purported military achievements and gun expertise made him, in Hinkson's eyes, the perfect candidate to carry out a murder-for-hire plan. That Swisher in fact lied about his military record does not, in any way, alter the conclusion that Hinkson believed in his lies, and thought of him as capable of executing a hit. The issue at trial was not whether Swisher was a decorated veteran (he did in fact serve overseas in the Marines), but that Hinkson believed that Swisher had the mili-

tary and combat experience necessary to carry out a contract hit. To be sure, Swisher's puffed-up misrepresentations and misdeeds are shocking and offensive. But this collateral issue fails to undermine other evidence in the record demonstrating Hinkson's firm belief in Swisher's qualifications for the job.

The record supports a very plausible explanation for Swisher's lies: his desire to continue receiving benefits from the Veterans Administration under a fraudulent cover story that he also told his friend Hinkson. The great lengths that Swisher went to at trial to defend his military record — the bold lies, the convenient backstory, the forged document — make it more probable, not less, that Swisher convincingly puffed to his friend Hinkson, that Hinkson bought the story, and that Hinkson then solicited Swisher to kill the federal officials.

Other portions of Swisher's testimony, corroborated by Hinkson himself, supported these inferences. According to Swisher, Hinkson first asked him in April 2002 to torture and kill Dennis Albers, an attorney who had once won a large judgment against Hinkson on behalf of a former WaterOz employee. That Hinkson and Swisher both loathed Albers was no state secret. When Albers was running for public office in the fall of 2000, he started an "Unelect Dennis Albers Campaign." Hinkson also admitted that he had once said about Albers, "God needs to smite him" because "he was putting innocent people in jail." Swisher also had "bad feelings" towards Albers because he had prosecuted Swisher (unsuccessfully) twenty years before. Swisher acknowledged at trial that he may have spoken with Hinkson about his hostile feelings for Albers, and possibly participated in Hinkson's campaign to "unelect" Albers.

According to Swisher, the first object of Hinkson's murder-for-hire scheme was their mutual enemy, Albers. But Swisher thought Hinkson was kidding, and he told Hinkson unequivocally to knock off talk like that. Only a few months later, Swisher again solicited Swisher, this time to kill Cook, Hines,

and their families, but Swisher warned Hinkson that he would report him to the authorities if he brought it up again. By the third solicitation, Swisher knew that Hinkson was dead serious. At that point, Swisher reported the solicitation to an Idaho prosecutor and then the FBI was called in.

At trial, the defense hit Swisher hard on cross-examination and repeatedly attacked his credibility. In over eighty pages of cross-examination, Hinkson's attorneys explored Swisher's credibility with endless efforts to impeach him on different subjects: his bias ("[Hinkson] needs to discredit me in the worst way"); his deteriorating relationship with Hinkson (testifying about an attempt on his life and concluding that it must have been Hinkson because "no one else [ ] hates me bad enough"); his credibility (Swisher testified that he would consider killing someone for a half million dollars); and his previous legal involvement with Hinkson (Swisher admitted that Hinkson had sued him as a third party in an earlier Idaho state court civil action, and Swisher filed a cross-claim against him).

Swisher's testimony aside, other evidence presented at trial cemented the government's case against Hinkson. Witness after witness testified to Hinkson's express, intense desire that Hines, Cook, and Lodge be tortured and killed. Lonnie Birmingham, a WaterOz employee and close friend of Hinkson, testified that Hinkson had told him that he "wanted [Cook, Hines, and Lodge] killed" because "he felt like they were conspiring to come after him to destroy him." Bellon talked with Hinkson for hours on end about Hinkson's belief of a government conspiracy against him. Bellon described Hinkson's anger towards the officials prosecuting him as the "central focus of his life." After he violated the terms of his bond in the tax case, Hinkson told FBI Agent William Long during an interview that he hoped Cook, Hines, and Lodge would die, and that he had "vented about Judge Lodge, Nancy Cook, Steve Hines, and Dennis Albers." Long also disclosed that Hinkson admitted telling Harding that "if someone were to

kill them [Cook, Hines, and Lodge], it would be worth $10,000 to me."

Harding's account of Hinkson's solicitations was almost identical to Swisher's account of his solicitations. Harding met Hinkson through a mutual friend in late 2002. Harding testified that in January 2003, Hinkson handed him a large wad of cash purported to be $10,000, and promised another $10,000, if Harding killed Lodge, Cook, and Hines. Anne Bates, a friend of Harding who was in the same room at the time of the alleged offer, corroborated this account. Over a three-month period, Hinkson allegedly repeated his offer to Harding and raved that the officials' families, and then the officials themselves, should be tortured before they were murdered. According to Harding, Hinkson once stated that the officials should be murdered with "multiple shots and then a kill shot." Bates also stated that she overheard Hinkson say to a third party in 2003 that Hines and Cook "should watch their children be killed," and that Hinkson "wanted them dead."

The jury concluded that Hinkson solicited Swisher because the evidence compelled that verdict. The credible detail in Swisher's testimony, plus other evidence backed up by Hinkson's admissions and corroboration from third parties, including law enforcement, dispel any notion that Swisher's military service was a centerpiece or the linchpin of the trial.

## Appellate Review of Denial of the Motion For New Trial

Our review of the denial of a motion for new trial is governed by the long-standing abuse of discretion standard. The defendant bears a "significant burden" to overcome this standard. *United States v. Endicott*, 869 F.2d 452, 454 (9th Cir. 1989). According to our precedent, reversal under this standard is permissible only when we are firmly convinced that the district court committed a clear error in judgment. Put another way, reversal is justified only "when the appellate court is convinced firmly that the reviewed decision lies

beyond the pale of reasonable justification under the circumstances." *Harman v. Apfel*, 211 F.3d 1172, 1175 (9th Cir. 2001). To give texture to this standard, it is critical that we not only give deference to the district court but engage in some degree of self-reflection that we are true to our role as a reviewing court rather than as a trial court.

In assessing the exercise of discretion, the district court's denial of a new trial is benchmarked against the standards in *United States v. Harrington*, 410 F.3d 598, 601 (9th Cir. 2005). *Harrington* sets out five criteria that the moving party must satisfy to warrant a new trial on the basis of new or newly discovered evidence: (1) the evidence is newly discovered; (2) the failure to discover the evidence sooner is not attributable to lack of diligence by the defendant; (3) the evidence is material to the issues at trial; (4) the evidence is neither cumulative nor merely impeaching; and (5) the evidence indicates that a new trial will probably result in an acquittal. *Id.* (citing *United States v. Kulczyk*, 931 F.2d 542, 548 (9th Cir. 1991)). The majority's de novo conclusions that the district court was wrong in evaluating *every Harrington* factor is more than a stretch.

As a general matter, evidence that is "merely cumulative or impeaching" is not ordinarily "an adequate basis for the grant of a new trial." *Mesarosh v. United States*, 352 U.S. 1, 5 (1956). It is no leap to conclude that the prospect of impeachment on a collateral issue also does not warrant a new trial. Hinkson does not satisfy even the first two factors — newly discovered evidence and diligence — nor does he meet the remaining criteria. Finally, it bears noting that the majority hints at government impropriety with respect to the production of evidence regarding Swisher's military record. Op. at 6111-12. Speculation on this point ignores the district court's explicit findings:[2]

---

[2]It is not our role to speculate about fax lines and timing of receipt of documents. In any event, after argument in this appeal, the government was asked to submit further documentation of the timing of its knowledge of the Dowling letter about Swisher's records. Nothing in that letter undermines the district court's findings.

[T]he Government did not fail in its disclosure obligations. Furthermore, there is no factual link whatsoever between the government's conduct here and any alleged wrongful conduct on the part of witness Swisher. There is no indication that the Government had any awareness that any of Swisher's testimony regarding his military background could be false prior to defense counsel's mid-trial receipt of the surprise letter from the National Personnel Records Center.

I object to the majority's effort to override the district court record. If the district court's findings are clearly erroneous, then reversal on that point would be in order. Alternatively, if there remains a substantial question as to the timing and receipt of evidence regarding Swisher's military record, then the case should be remanded to the district court for further hearing and findings on that issue. But the worst of all worlds is to sprinkle the opinion with innuendo and then simply let it hang there as a backdrop to the remainder of the opinion.

## 1. Newly Discovered Evidence

The majority summarily discounts the newly discovered evidence factor in concluding that neither the Miller nor the Woodring affidavit were in the possession of the defense (or the government) until after the trial.[3] It goes without saying

---

[3]The majority also notes that Swisher has been convicted for the fraudulent wearing of a military decoration and the making of false statements to obtain veterans benefits. Op. at 6123-24. This information was not, of course, before the district court as part of Hinkson's new trial motion, and it would be inappropriate to permit this recent event to influence our evaluation of the district court's decision three years ago on the new trial motion. *See United States v. Boberg*, 565 F.2d 1059, 1062 (8th Cir. 1977) (declining to decide a new trial motion on the basis of new evidence where it had not been previously presented to the trial court). As the majority appears to acknowledge this point, one wonders the purpose of recitation of this after-the-fact information.

that neither affidavit was or could have been in the trial record, as they were not offered or procured until *after* the trial. But that superficial analysis begs the question. As the district court noted, "the substance of both proffered documents is not new[.]"

The Miller and Woodring affidavits added nothing of substance to the mix of information available to both sides before trial ended. The Miller affidavit essentially repeated information that had already been uncovered, e.g., that Swisher had not been awarded any military service awards, including a Purple Heart; that the replacement DD-214 did not exist in Swisher's official military file and was likely not authentic; and that his injuries stemmed from a vehicle accident, not from combat. The only matter of substance mentioned in the Woodring affidavit that the defense had not previously known is Woodring's declaration that his signature on the replacement DD-214 was forged. But this revelation barely makes a ripple in contrast to the information that was uncovered before trial ended. The record supports the district court's conclusion that nothing of significance offered by the defense in support of its new trial motion qualified as newly discovered evidence. Although the court had acknowledged at trial that the file was "very difficult to decipher," with the benefit of briefing and the entire record, it concluded that the "new" evidence offered by the defense was not newly discovered. That conclusion alone should end the new trial inquiry.

The sequence of events leading to Swisher's testimony about his military record is instructive on the first and second *Harrington* factors. On direct examination, Swisher testified that he told Hinkson that he served in the Marine Corps; that he discussed his military service with Hinkson; and that he told Hinkson that he had killed "too many" people. After an extensive and withering cross-examination, defense counsel admitted in a side-bar colloquy that it had been digging into Swisher's military history and decided to cross-examine Swisher on that point. As the district court noted, defense

counsel "opened the door on this," i.e., the subject of Swisher's military service.

At the close of its cross-examination of Swisher, defense counsel had in its possession the Tolbert letter, which stated that Swisher's record failed to show that he was ever awarded any personal decorations. With the court's permission, counsel reopened cross-examination to explore the military service issue. When that examination backfired and Swisher produced the replacement DD-214, there was extensive discussion between the court and counsel over how to proceed.

The district court was open-minded as to how to address the military commendation issue. Recognizing that defense counsel opened the door and that "ordinarily, under the rules, you are stuck with the witness' answer and the court has the discretion to restrict further collateral proof of that impeachment," the court nonetheless suggested that counsel could continue cross-examination. The court also stated that another option would be to instruct the jury to disregard the testimony relating to the Purple Heart. With the consent of defense counsel, the court ultimately finessed the situation by telling the jury that the court had erred in permitting the inquiry and gave the following remedial instruction:

> [I]t's been a long day; and I now realize that I made a mistake in allowing the question with regard to the Purple Heart Medal. So I am going to instruct you to disregard completely all of Mr. Swisher's testimony with regard to that military commendation.

Although defense counsel marked the available documents as exhibits, they were neither offered, nor refused, as evidence. Nor did counsel attempt to procure an actual witness on the subject of Swisher's military history, although it could have done so before close of the trial. The defense did not request a short continuance or offer another remedial alternative to the court. In the end, defense counsel accepted the pro-

posed instruction and made a deliberate choice not to re-examine Swisher a third time.

The majority excuses the defense's decision not to reopen cross-examination of Swisher because "[c]ounsel could hardly have anticipated that Swisher, after being shown the [Tolbert] letter, would pull from his pocket a forged document purporting to provide a superseding account of his military service." Op. at 6129. While Swisher's dramatic production of the letter was unexpected, counsel still had a number of options to impeach Swisher. Defense counsel's failure to prepare a back-up plan in the event that Swisher did anything but wilt and confess his sins on the stand was a choice that it made.

Given the time available for the defense to investigate Swisher's record, and the juicy material that it could have culled from information available to it — ranging from the time of Swisher's service, to his signature on the original DD-214, to the fact that the replacement DD-214 was apparently not authentic — the defense had plenty of grist for the mill. The district court was flexible, and offered the reopening of cross-examination to explore these issues. Yet, the defense simply made the strategic decision not to go down that path.

## 2. Due diligence

Without deference to the district court's analysis, the majority concludes that "[i]n our view, defense counsel were diligent in looking for evidence that could be used to impeach Swisher." Op. at 6129. The majority's extensive discussion of this diligence nowhere cites to the district court's conclusion that Hinkson "is unable to establish that the failure to discover this evidence was not due to his counsel's lack of diligence" and that "the Court finds that defense counsel had ample time to investigate Swisher's record prior to trial, but was not diligent in pursuing the issue."

The district court's findings were not clearly erroneous. For starters, Hinkson's attorneys admitted at trial that they had been suspicious "[f]or quite sometime" about Swisher's military credentials because "of his age and because of the time of the war." Three months prior to Hinkson's criminal trial on the solicitation charges, one of Hinkson's attorneys deposed Swisher as part of the multi-party Idaho state court lawsuit against Hinkson. At that time, Hinkson's lawyers were skeptical about Swisher's record. Swisher stated during this deposition that he was born January 13, 1937. As a matter of public record, the Korean conflict began in 1950 and fighting ended in 1953.[5] If Swisher had served in the "Korean War," as he had claimed, he would have been 13 to 16 years old at the time of his alleged service—certainly a red flag as to the possibility that he was not being truthful about his military record. At the same deposition, Swisher stated that he had constantly suffered from back pain because he had suffered two grenade injuries while he was in the military. He made these same claims in two grand jury appearances in 2002 and 2004, which led to Hinkson's indictments. The defense received those transcripts a week before trial. Defense counsel admitted that he knew, based on Hinkson's prior testimony before the grand juries, that "I should be very careful in my cross-examination of him."

All of these facts were on the table and subject to investigation *before* the trial began and certainly before trial ended. Even during trial, once more facts came to light, counsel could have subpoenaed witnesses on this subject. But it chose not to, a strategic decision that cannot now be the basis of the grant of a new trial motion. The district court had first-hand experience with the discovery chronology and the diligence of defense counsel. Nothing supports the majority's rejection of

---

[5]Encyclopedia Britannica Online, Korean War, http://www.britannica.com/eb/article-9046072/Korean-War (last visited May 16, 2008).

the district court's explicit findings regarding lack of diligence.

### 3.    Materiality

The next question for consideration under *Harrington* is whether the evidence about Swisher's military record was material to the issues at trial. The district court held that the "proffered 'new' evidence is not material to the issue at trial[.]"

I cannot think of a clearer example of a collateral issue than Swisher's military service.[5] "Ordinarily, evidence impeaching a witness will not be material . . . because it will not refute an essential element of the government's case." *United States v. Davis*, 960 F.2d 820, 825 (9th Cir. 2005) (citations omitted). Evidence that Swisher allegedly lied during the course of Hinkson's past trial will not refute an essential element of the government's solicitation case against Hinkson at a new trial nor would the evidence be central to a new trial. The ultimate issue at a new trial is whether Hinkson solicited Swisher in the murder-for-hire scheme. Whether Hinkson was prompted to do so by his belief that Swisher had the qualifications to be an assassin is a related issue, although not one that depends on Swisher's actual military record. But Swisher's *actual* military record, and whether he was truthful about it, are collateral points. Ironically, Swisher's puffing of his military achievements makes it even more likely that Hinkson would have found him to be a suitable candidate. In any event, the veracity of Swisher's military record will not be material to the issues at a new trial and can only be described as a classic sideshow.

---

[5]Contrary to the majority's characterization, materiality is not co-extensive with the fifth *Harrington* factor of whether acquittal would be probable. *See United States v. George*, 420 F.3d 991, 1001 (9th Cir. 2005) (concluding that the newly discovered evidence was "not material[,]" as "[i]t would have only established a collateral point").

To be sure, Swisher is a key witness for the government, and his credibility is on the line. But the military service portion of his testimony was, relative to the rest of his testimony, unimportant. A district court "may well find it probable that an acquittal would result on retrial" when "the *bulk* of a key witness' testimony is otherwise shown to be false." *Krasny*, 607 F.2d at 845 (emphasis added). Swisher's testimony spanned over one hundred pages. Only three pages related to his Purple Heart and military service, and that portion was ultimately stricken from the jury's consideration. The "bulk" of his testimony has not been proven false. Thus, while *Davis* recognizes that impeachment evidence may be so powerful that "it could render the witness' testimony totally incredible[,]" 960 F.2d at 825, such is not the case here. Hinkson's perception of Swisher's purported prowess and daring, not the truth of his military record, is the real issue.

The district court also held that while information about Swisher's record could be used for impeachment purposes, the documents and testimony by collateral witnesses would be inadmissible extrinsic evidence under Federal Rule of Evidence 608(b).[6] Rule 608(b) bars introduction of extrinsic evidence of a witness's past conduct. On cross-examination, the witness may be impeached by referencing documents and probing his veracity or "character for truthfulness or untruthfulness." *United States v. Abel*, 469 U.S. 45, 55 (1984). Nonetheless, Rule 608(b) "limits the inquiry to cross-examination of the witness . . . and *prohibits* the cross-examiner from introducing extrinsic evidence of the witness' past conduct." *Id.* at 55 (emphasis added). The district court also held that, on balance, the evidence was barred under Rule 403 because it would have "wasted considerable trial time on a confusing,

---

[6]The majority's discussion of the wearing of the Purple Heart by Swisher seems misplaced. *See* Op. at 6133-34. That testimony was stricken, and there is little likelihood that this circumstance will be repeated at a new trial, such that the documents would be admissible as evidence to contradict a witness's statement.

tangential issue unrelated to the factual issues to be resolved by the jury." These evidentiary rulings also undermine the defense's claim that impeachment of Swisher's military record will blossom into substantive evidence at a new trial.

## 4.  Neither Cumulative Nor Merely Impeaching

The fourth factor for consideration is whether the alleged new evidence is "neither cumulative nor merely impeaching." The evidence here fails on both counts. As the district court concluded, the proferred "new" evidence was cumulative of other information that was already available to the defense prior to the conclusion of trial, such as the Tolbert letter and the Dowling letter. Those documents established, among other things, that the replacement DD-214 was a forgery and that Swisher had lied about receiving military awards. The "new" evidence, while more extensive, essentially confirms those facts.

The evidence is also plainly "merely impeaching," by any definition of the term. Evidence that Swisher lied with respect to his military record may affect the jury's estimation of his credibility on the stand. But its sole use at a new trial would be to impeach Swisher. Impeachment evidence that renders a witness's testimony totally incredible may be "material," within the meaning of the third *Harrington* factor, where the impeached witness's testimony was "uncorroborated and provided the only evidence of an essential element of the government's case." *Davis*, 960 F.2d at 825. But that circumstance does not describe the evidence here. To adopt the majority's view would require us to ignore all of the corroborating and circumstantial evidence pointing to Hinkson's guilt.

## 5.  Probable Acquittal at a New Trial

The final consideration is whether the new evidence would probably result in Hinkson's acquittal at a new trial. The district court noted that the "Federal Rules of Evidence would

not apply any differently in a new trial," such that "the proferred extrinsic evidence would . . . [not] probably result in an acquittal."

The "newly discovered" evidence fails this fifth prong of the *Harrington* test because it simply does not make an acquittal probable. The majority states that to convict Hinkson of solicitation, a jury at a new trial must believe that Swisher "had been serious" in asking Swisher to kill Cook, Hines, and Lodge. Op. at 6143. The government has ample ammunition against Hinkson to establish beyond a reasonable doubt that Hinkson solicited Swisher. A new trial cannot erase the long, detailed history between Hinkson and Swisher. It will not change the undisputed testimony that Hinkson believed that Swisher, as a result of his military background and gun expertise, had the wherewithal to execute a hit. Nor will it erase the third party testimony that Hinkson wanted the three officials killed, that he hoped that they would die, and that to him, it would be worth at least $10,000 a head for that to happen. In short, nothing in the record suggests that the district court abused its discretion in concluding that a new trial would probably not result in Hinkson's acquittal.

The majority suggests that the evidentiary deck was equally stacked against Hinkson on the Swisher-related counts as on the Harding-related counts, implying that Swisher's tales of military awards and combat injuries might have swayed the jury to convict Hinkson only on the Swisher-related counts.[7] But the effort to construct perfect parallels between Swisher and Harding is too simplistic. There were myriad reasons other than those listed by the majority that may have made

---

[7]The majority writes that "Swisher presented himself as a United States Marine who had been wounded in service of his country" and was a "decorated war hero." Op. at 6165. But the district court instructed the jury to disregard all of the Purple Heart testimony, an instruction that we assume the jury followed. *See United States v. Jimenez Recio*, 371 F.3d 1093, 1101 n.6 (9th Cir. 2004).

Hinkson's guilt seem more solid to the jury on the Swisher counts. Unlike Swisher, who had known Hinkson for over two years and been a close friend at the time of the alleged solicitations, Hinkson had known Harding for only a few weeks before the first time that he allegedly asked Harding to kill three federal officials. Hinkson knew Swisher to be a vindictive person who, like Hinkson, acted on his dislike for those who had "wronged" him, like Albers. Hinkson had known Swisher through his regular consulting work for WaterOz, whereas Harding was a sometime radio show host who had recently worked on shows dealing with the paranormal. The fact that Hinkson *believed* Swisher to have significant combat experience was yet another reason that a solicitation to Swisher was both believable and a pragmatic choice. Swisher's lies simply enhanced his prowess from Hinkson's perspective. These distinctions illustrate that the Harding and Swisher solicitations cannot be neatly squared off, with evidence of Swisher's *actual* rather than *represented* military service tipping the scales at a new trial.

In reviewing the district court's denial of a new trial, we must be mindful of the factors articulated in *Harrington* and the deference accorded to the district court in making its discretionary ruling on a new trial. The district court provided a long and thoughtful recitation of his weighing of each of these factors. No legal error undermines that conclusion, and nothing in the district court's reasoning and conclusions was an abuse of discretion.

I respectfully dissent from the majority's decision to grant Hinkson a new trial. At most, I would remand for further fact-finding on the issue of when the government knew, or should have known, of the Dowling letter. In doing so, if warranted by evidence of the government's knowledge, I would give the district court the first opportunity to evaluate a new trial motion under the *Zuno-Arce* test. *United States v. Zuno-Arce*, 339 F.3d 886 (9th Cir. 2003). Barring a majority for remand, I would affirm the denial of the motion for a new trial.